UNITED STATES of America, Appellee,

v.

Ernesto DOMINGUEZ, Angel Louis
Estevez and Carlos Sarmiento,
Appellants.

UNITED STATES of America, Appellee,

v.

Nollie S. ALEXANDER, Appellant.

UNITED STATES of America, Appellee,

v.

Ronnie Wayne NEILL, Appellant.

Nos. 78–5112, 78–5114 and 78–5115.

United States Court of Appeals,
Fourth Circuit.

Argued March 6, 1979.

Decided Aug. 10, 1979.

Edward Shohat, Miami, Fla. (Bierman, Sonnett, Beiley & Shohat, P. A., Miami, Fla., on brief), Robert White Johnson, Wilmington, N. C. (Crossley & Johnson, Wilmington, N. C., on brief), Dwight F. Drake, Columbia, S. C., for appellants.

Herman E. Gaskins, Jr., Sp. Asst. U. S. Atty., Raleigh, N. C. (George M. Anderson, U. S. Atty., Raleigh, N. C., on brief), for appellee.

Before BUTZNER and RUSSELL, Circuit Judges, and EDWARD DUMBAULD, Senior District Judge for the Western District of Pennsylvania, sitting by designation.

BUTZNER, Circuit Judge:

Nollie S. Alexander, Ernesto Dominguez, Angel Estevez, Ronnie Wayne Neill, and Carlos Sarmiento appeal their convictions of conspiracy to import marijuana into the United States in violation of 21 U.S.C. §§ 952(a), 960(a)(1), 963, 841(a)(1), and 846. We affirm.

During the spring of 1977, Wade Bailey, the captain of a fishing trawler in Wrightsville Beach, North Carolina, was approached by two of the defendants,[1] who suggested that Bailey assist them in smuggling a large load of marijuana. Bailey reported this to an officer of the United States Customs Service and agreed to cooperate with the Service in order to obtain a reward for capture of the smugglers.

In the succeeding months, Bailey met repeatedly with several groups of the defendants to arrange a smuggling operation. He reported to the Customs Service after each meeting. The Service instituted its own surveillance on at least one occasion to confirm the accuracy of Bailey's information.

The defendants eventually agreed on a plan calling for a rendezvous at sea with a Bahamian freighter, the *Sea Crust*, owned and operated by Alexander, to pick up a large cargo of marijuana. Bailey's boat, the *Osprey,* was to head for a prearranged point about 40 miles off the coast of North Carolina. The *Osprey* was to broadcast a

---

1. Several of the defendants have not appealed. Their names are omitted from this opinion for the sake of clarity.

coded message on a specified radio frequency in order to signal the *Sea Crust*. Bailey was furnished a description of the *Sea Crust* so that he would be able to recognize it. Bailey relayed all of this information to the Customs Service.

Pursuant to the plan, Bailey went to sea with two of the defendants. The *Osprey* broke down, however, and they returned to Wrightsville Beach without making contact with the *Sea Crust*. The next day the *Osprey* again failed to make contact with the *Sea Crust*. Bailey and his crew returned to port intending to try once more.

The defendants, however, became suspicious that the *Osprey* was under surveillance by government agents. They decided that it could not be used to meet the *Sea Crust*, and they began attempts to locate another small boat for the purpose. Bailey conveyed this information to the Customs Service.

Upon learning that the *Osprey* would not be used for the rendezvous, the Customs Service asked the United States Coast Guard to locate the *Sea Crust*. The Customs Service gave the Coast Guard the rendezvous coordinates, the radio frequency, the code words, and the description of the *Sea Crust*. The Coast Guard dispatched a cutter to the general location of the planned rendezvous. After repeatedly broadcasting the code on the assigned frequency, the cutter received the prearranged response. The message from the ship confirmed that its captain's name was Alexander and directed the cutter to a location near the point at which the *Osprey* had attempted to make contact.

Approximately 40 miles off the coast of North Carolina, the cutter and a Customs Service airplane sighted a stationary ship. The ship bore the name *Sea Crust* and claimed a home port of Nassau, Commonwealth of the Bahamas. The vessel matched the descriptions which Bailey and the Drug Enforcement Administration had supplied. When hailed by the cutter, the *Sea Crust* immediately unfurled a Bahamian flag on its staff, started its engines, and began moving away from the coast of the United States. It radioed that its destination was Baltimore, Maryland and refused to stop.

The Coast Guard cutter and the Customs airplane began following the *Sea Crust*. Meanwhile, the Coast Guard obtained through the State Department permission from the government of the Commonwealth of the Bahamas to board and search the *Sea Crust*.

When the commander of the cutter told the *Sea Crust* that the Bahamian government had authorized a search, and ordered it to heave to, Alexander stated that the ship was really British, not Bahamian. The commander replied that this change of nationality on the high seas rendered the *Sea Crust* a stateless vessel, and therefore it was subject to search under American law. Alexander still refused to stop until the cutter fired warning shots across the bow of the *Sea Crust*. A Coast Guard boarding party boarded the *Sea Crust*, which by this time was more than 200 miles from the shore of the United States. The boarding party found six tons of marijuana. About three hours later, the Coast Guard informed its cutter that the Bahamian government had authorized seizure of the *Sea Crust* and the arrest of all persons on board. The cutter's commander promptly complied.

The Bahamian Ministry of External Affairs sent the American Embassy a written confirmation of the permission to seize the *Sea Crust*. The letter referred to a ship "Sea Crust" with registration number 343707, whereas the ship which was actually seized had registration number 356095.

After an extensive trial at which Bailey was the principal witness for the government, all eighteen of the defendants were convicted.

I

Alexander, joined by the other appellants, argues that the district court erred in refusing to suppress the evidence seized on board the *Sea Crust*. He contends that the

Coast Guard lacked jurisdiction to search and seize the ship because it was a foreign vessel on the high seas. He also argues that the search and seizure violated the Convention on the High Seas.

 The answers to the questions Anderson raises are found in 19 U.S.C. §§ 1581(h) and 1587(a) and 14 U.S.C. § 89(a). Although the United States and the Commonwealth of the Bahamas are parties to the Convention on the High Seas, we need not determine the legality of the seizure by the terms of this treaty. Sections 1581(h) and 1587(a) of Title 19 authorize a United States officer to board a foreign vessel and enforce the laws of the United States in contravention of a treaty pursuant to "special arrangement" with the foreign government where the ship claims registry. Where, as here, some overt acts in furtherance of the conspiracy took place in the United States, 14 U.S.C. § 89(a) authorizes the Coast Guard to apprehend and arrest co-conspirators on the high seas and to search for and seize contraband. *See United States v. Postal*, 589 F.2d 862, 884 (5th Cir. 1979); *United States v. Cadena*, 585 F.2d 1252, 1259 (5th Cir. 1978); *United States v. Winter,* 509 F.2d 975, 980–83 (5th Cir. 1975).

 The permission granted by the Commonwealth of the Bahamas to board and seize the *Sea Crust* and to arrest its crew was a "special arrangement" within the meaning of 19 U.S.C. §§ 1581(h) and 1587(a). Consequently, the Coast Guard was authorized to exercise the powers conferred on it by 14 U.S.C. § 89(a).

 Alexander suggests that the discrepancy between the registration number of the vessel boarded by the Coast Guard on the one hand, and the number of the vessel referred to the Bahamian government's confirming letter on the other, means that the arrangement did not authorize the United States to board his ship. The record contains no evidence, however, that the government of the Bahamas ever disapproved the boarding of the *Sea Crust*. The registration number was in fact an incidental detail. The number was not even available to the Coast Guard until after the vessel was boarded. In the absence of any protest from the Bahamas, which had jurisdiction over the *Sea Crust* on the high seas,[2] Alexander may not assert that the United States violated the special arrangement between the two governments.

Alexander's contention, for which he offers no authority, that the special arrangement unconstitutionally invaded the prerogatives of the President to make treaties with the advice and consent of the Senate is also without merit.

 The *Sea Crust's* change of flag to avoid boarding pursuant to the permission granted by Bahama could not frustrate the Coast Guard. On the contrary, the *Sea Crust's* deception enlarged the authority of the Coast Guard and created an additional justification for boarding. By attempting to change its nationality on the high seas, the *Sea Crust* became a stateless ship. This conferred on the United States jurisdiction over the ship supplying an independent basis for Coast Guard action under 14 U.S.C. § 89(a). Freedom of navigation on the open sea exists only for vessels which properly sail under the flag of one sovereign state. I Oppenheim, International Law 595–96 (7th ed. 1948). International law forbids changes of nationality on the high seas. Convention on the High Seas of 1958, Art. 6.[3] A ship which asserts such a change enjoys the protection of neither state and derives no rights under international law. *See Molvan v. Attorney General for Palestine*, [1948] A.C. 351, 369–70. We conclude that the *Sea Crust's* attempted change of

---

2. *See* Article 6, Convention on the High Seas, 13 U.S.T. at 2315.

3. Its preamble declares that the Convention on the High Seas codifies established principle of international law relating to the high seas.

nationality on the high seas subjected the vessel to the jurisdiction of the United States for the purpose of enforcing the laws of the United.States pursuant to 14 U.S.C. § 89(a).

■ The remaining issue in our analysis of the Coast Guard's authority under 14 U.S.C. § 89(a) is whether the statute, as applied, violated the fourth amendment.[4] The rights of Dominguez, Estevez, Neill, and Sarmiento cannot have been violated. None of them was on board the *Sea Crust* when it was searched and none alleged an ownership interest in the ship or its cargo. *See Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 425, 58 L.Ed.2d 387 (1978). Alexander, on the other hand, owned the vessel and was aboard when it was searched. He therefore had standing to move for suppression of the evidence. *Cf. United States v. Cadena,* 588 F.2d 100, 101–02 (5th Cir. 1979).

Alexander first stresses that the search was conducted without a warrant and argues that none of the exceptions to the warrant requirement was satisfied. We think, however, that the facts amply demonstrate that no warrant was required. The aggregate of the information secured from Bailey, the information obtained independently by the Customs Service and the Drug Enforcement Administration, and the Coast Guard's own contacts with the *Sea Crust* unquestionably gave the Coast Guard probable cause to believe that the vessel was part of an ongoing conspiracy to smuggle contraband into the country. The *Sea Crust* had mobility comparable to that of an automobile. *Cf. United States v. Cadena,* 588 F.2d 100 (5th Cir. 1979). As soon as they spotted the Coast Guard cutter, the crew of the *Sea Crust* attempted to flee. The evidence available to the Coast Guard suggested a substantial likelihood of destruction of evidence or consummation of

the smuggling plan if boarding were unnecessarily delayed. These exigent circumstances, combined with the clear presence of probable cause, justified the warrantless search.

Alexander also contends that the difference between the actual registration number of the *Sea Crust* and the registration number referred to in the confirming letter from the government of the Bahamas establishes a violation of the explicit requirement of the fourth amendment that search warrants particularly describe the place to be searched. The confirmation was not a warrant, however, and we have held that no warrant was required.

Therefore, we conclude that the Coast Guard complied with both domestic and international law when it boarded the *Sea Crust,* seized the vessel and its cargo of contraband, and arrested its crew.

## II

Ernesto Dominguez assigns error to the district court's denial of his motions for a judgment of acquittal. He concedes that he was in North Carolina in the company of two conspirators and that he was present at three meetings with conspirators at which the smuggling operation was planned. He stresses, however, that there is no evidence that he ever said or did anything at those meetings. He argues that the evidence shows nothing more than his presence and that this does not suffice to prove his guilt.

■ We agree with Dominguez's contention that evidence of mere presence or association is insufficient to support a conviction for conspiracy. We held as much in reversing a conviction in *United States v. Stroupe,* 538 F.2d 1063, 1066 (4th Cir. 1976). We cannot, however, accept the proposition that the government must produce direct evidence of acts done or words spoken by a

---

4. The government has suggested alternatively that the fourth amendment is inapplicable. In view of our conclusion that the Coast Guard did not violate the amendment, we need not examine the government's alternative contention, and we do not express an opinion on this issue.

defendant in order to convict him of conspiracy.

The test for deciding a motion for a judgment of acquittal is whether "the evidence and inferences therefrom most favorable to the prosecution would warrant the jury's finding the defendant guilty beyond a reasonable doubt." *Burks v. United States,* 437 U.S. 1, 16, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978). This standard applies to each material element of the offense. In the present case, this means that the jury must have been warranted in finding beyond a reasonable doubt that a conspiracy existed, that Dominguez knew of it, and that he voluntarily became a part of it.

▉ There can be no doubt not only that a conspiracy existed but also that Dominguez knew of it. As to the third essential element, voluntary participation, we think the evidence more than sufficed to present a jury question. Dominguez was in North Carolina, 800 miles from his home, in circumstances from which the jury could reasonably infer that he had come to the state for the purpose of aiding the conspiracy. The only evidence of innocent motive for Dominguez's presence in North Carolina was the statement of his codefendant Sarmiento that Dominguez, Estevez, and he had come to North Carolina to hunt and fish. This exculpatory statement was false. The evidence established that Sarmiento played an active role in the conspiracy while he was in North Carolina. There was no evidence whatsoever that upon learning the character of the conspiratorial meetings, Dominguez made any effort to extricate himself. Instead he attended two subsequent meetings and was arrested at what appears to have been the headquarters of the smuggling operation. There the government agents seized a radio frequency sweeper (a "bug detector"), a list of radio frequencies matching the frequencies on the single sideband radio on the *Sea Crust,* a VHF walkie talkie which matched a walkie talkie found on the *Sea Crust,* and a scanner device which monitored police broadcasts.

Therefore, we conclude that the district court correctly denied Dominguez's motions for a judgment of acquittal. *Cf. United States v. Blackshire,* 538 F.2d 569, 571 (4th Cir. 1971).

### III

The appellants also assign error to the district court's refusal to allow certain impeachment of Bailey. They stress that Bailey was the prosecution's principal witness, and they attack the court's curtailment of questions which sought to obtain admissions from Bailey that while he had been working undercover for the government in another case which followed the seizure of the *Sea Crust,* he had "skimmed" some of the smuggled marijuana and was selling it. On appeal they argue that Bailey had subjected himself to the possibility of prosecution and that the inquiry into these events was proper impeachment to show bias or self-interest.

▉ The scope of permissible impeachment of a witness in a criminal trial generally is committed to the sound discretion of the trial court. Rule 403, Fed.R. Evid.; *Alford v. United States,* 282 U.S. 687, 694, 51 S.Ct. 77, 75 L.Ed. 736 (1931). That discretion must be exercised with due regard for the constitutional rights of the defendant. *See Smith v. Illinois,* 390 U.S. 129, 131–33, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968). The trial court, however, retains the basic power to prevent cumulative or harassing impeachment.

A review of the record indicates that the district court allowed extensive impeachment of Bailey's credibility. The court permitted questions which elicited that Bailey's primary motive for assisting the government was the expectation of a monetary reward; that he had taken $43,000 from the defendants and had not turned it over to the government; that he might have been willing to smuggle marijuana himself had he not been working for the government; that he had a prior conviction; and that he did not support his children. Moreover, the

district court did not limit cross-examination of Bailey concerning his actions and motives with respect to the smuggling conspiracy for which the appellants were being tried.

 In view of the comprehensive impeachment evidence that was introduced and the thorough examination of Bailey concerning his transactions with the *Sea Crust* conspirators, exclusion of testimony about Bailey's illegal double-dealing in other smuggling was within the bounds of the court's permissible discretion.

Closely related to this assignment of error is the appellant's motion to supplement the record and to dismiss the prosecution. The motion to dismiss alleges that an Assistant United States Attorney knew that Bailey committed perjury when he denied skimming marijuana while working as an undercover agent in the other smuggling incident. Bailey's denial was not made known to the jury because the court had excluded this line of testimony.

 We grant the motion to supplement the record. The record as supplemented, however, does not sustain the charge that the prosecution knowingly acquiesced in the introduction of perjured testimony. Accordingly, the motion to dismiss is denied.

### IV

 The appellants also assign error to the district court's admission, over their objections, of certain testimony by John Dolan, a special agent of the United States Customs Service. The challenged testimony consisted of statements by Dolan which repeated statements made to him by Bailey during the course of Bailey's undercover work on the case. The appellants challenge the testimony as inadmissible hearsay relying on *United States v. Weil,* 561 F.2d 1109 (4th Cir. 1977).

Rule 801(d)(1) of the Federal Rules of Evidence provides that a prior consistent statement of a person who has testified and who has been subject to cross-examination is "not hearsay" and is admissible if it "is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive." As we noted in Part III, the impeachment of Bailey was rife with implications that his testimony was improperly motivated. More important for present purposes, the defendants also attempted to show that Bailey's testimony concerning two government exhibits was fabricated recently. Bailey's prior consistent statements were made long before he belatedly produced the items in question. Dolan's testimony was precisely the kind of testimony which is permitted by Rule 801(d)(1). Our decision in *Weil* is not to the contrary.

### V

Neill contends that the indictment against him should have been dismissed or that all evidence bearing his name should have been suppressed, because the government only learned his name during the course of an illegal arrest. Neill was arrested at the home of another defendant, Hobson Bennett, pursuant to a warrant naming Bennett and describing Neill, but naming him "John Doe, alias 'Red' ". The government did not learn his name until it arrested him. The district court adopted the finding of a United States magistrate that the arrest was unlawful because the government lacked probable cause to support the warrant. The court refused, however, to dismiss the indictment. After the government represented that all evidence against Neill except his name, was secured independently from the unlawful arrest, the court denied the motion to suppress.

 At the outset, we agree with the district court's holding that the unlawful arrest which resulted in the disclosure of Neill's name does not compel dismissal of the indictment. *United States v. Calandra,* 414 U.S. 338, 353–55, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974).

We also affirm the court's ruling denying suppression of other evidence against Neill. The fourth amendment's prohibition of unreasonable searches and seizures is intended to protect rights of privacy against arbitrary invasions by government officials. The exclusionary rule, which has evolved from this amendment, applies only when these rights have been violated. *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). In order to be subject to the exclusionary rule, evidence must, at a minimum, fall within the sphere of what reasonably can be regarded as private. We cannot accept Neill's argument that his name meets this standard. A name is simply the appellation by which a person chooses to be publicly designated. "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz v. United States,* 389 U.S. at 351, 88 S.Ct. at 511.

The illegality of an arrest does not in itself bar the introduction of evidence that has been otherwise obtained in a lawful manner. *Sutton v. United States,* 267 F.2d 271 (4th Cir. 1959). The primary evidence against Neill, which consisted of Bailey's testimony concerning Neill's meetings with other conspirators and a contract for a truck rented to Neill, had nothing to do with the unlawful arrest. Accordingly, we conclude that Neill's arguments relating to the unlawful arrest are without merit.

*AFFIRMED.*