**UNITED STATES of America**

v.

**James Arthur STREIFEL, Theodore Scott Jube, Steven Jube and Darlene Brennan, Defendants.**

**No. 80 Cr. 684(MP).**

United States District Court,
S. D. New York.

Jan. 16, 1981.

John S. Martin, Jr., U. S. Atty., S. D. New York by Lesley Oelsner, Asst. U. S. Atty., New York City, for plaintiff.

Sheryl Reich, New York City, for defendant Streifel.

Andrew M. Lawler, New York City, for defendant Theodore Scott Jube.

Oteri & Weinberg, Boston, Mass., by Martin G. Weinberg, and Ivan Fisher, New York City, for defendant Steven Jube.

Gerald Lefcourt, New York City, for defendant Brennan.

## OPINION

MILTON POLLACK, District Judge.

On September 25, 1980 in the Atlantic Ocean about 200 miles east of Cape Cod the Coast Guard boarded a coastal freighter of Panamanian registry, named the "ROONDIEP", and found 30 tons of marijuana in the cargo hold. The Coast Guard seized the ship and its cargo on behalf of and on authorization from the Government of Panama, which had authorized the boarding, (the United States had also authorized the boarding), and arrested the seven persons it found aboard—four United States citizens and three Britons.

Two of the arrested Americans, Scott Jube and his brother Steven, told the Coast Guard officers that they had obtained the marijuana in Colombia a few weeks earlier and had come north to deliver it. Each crew member on the ROONDIEP was to get $100,000 for the venture.

The four defendants herein were charged in a three count indictment with possession of a controlled substance with intent to distribute in violation of 21 U.S.C. §§ 812, 955; attempted importation thereof into the United States in violation of 21 U.S.C. §§ 812, 952, 960(b)(2) and 963; and conspiracy to commit those substantive offenses. They challenged the boarding and seizure of

the vessel by the Coast Guard on the grounds: (i) that it violated the rights of defendants under the Fourth Amendment and consequently the fruits of the seizure should therefore be suppressed; (ii) that it violated the scope of the authority of the Coast Guard under 22 U.S.C. § 2291(c)(1); and (iii) that the consent of the Panamanian government was ineffective. All other challenges to the indictment and the proceedings thereunder were expressly waived by the defendants.

A stipulation of the facts was agreed to and submitted to the Court in lieu of a scheduled hearing on these contentions and on the basis thereof after hearing argument of counsel, the Court denied the challenge by the defendants to the boarding and seizure of the vessel. The Court announced that an opinion would follow. The defendants thereupon pleaded guilty to the conspiracy and one substantive count in the indictment reserving for appeal their contentions with respect to the boarding and the seizure of the vessel. A date was fixed for sentence.

## I.

*The circumstances involved*

Briefly stated, on September 24, 1980 the ROONDIEP was 50 miles east of Cape Cod in the Gulf of Maine, drifting, dead in the water, with its engines off. A Coast Guard aircraft flying on routine patrol spotted the freighter, the bow of which was pointed south southeast at approximately 150 degrees. The aircraft circled the ship in order to learn the ship's name and home port and saw the names "ROONDIEP" and "PANAMA" painted on the ship's stern. The aircraft spent approximately 15 minutes circling the ship and concluded that the freighter's behavior was suspicious. As the aircraft was circling, the ship's engine was started up and the vessel got under way, heading south. After leaving the proximity of the vessel, the Coast Guard aircraft changed course and came upon the freighter again now proceeding south southeast. The aircraft was directed to maintain surveillance of the ship until arrival of a Coast Guard ship in the area. A Coast Guard cutter was ordered to intercept the ROONDIEP and keep it under surveillance which it did. The freighter acted and continued to act thereafter as if fleeing—starting and speeding up and dodging from one to another course out of normal shipping lanes, and headed into shoals. During the same day and night the Coast Guard vessel kept pace with the ROONDIEP and the latter's actions were evasive and inexplicable on any reasonable basis and evasive responses to inquiries from the Coast Guard officers were given on ship to ship radio by the freighter to the Coast Guard vessel. The Coast Guard had meanwhile learned that the freighter was away from its home base and 2,000 miles away from its last known port of call, proceeding outside of normal shipping lanes and avowedly with no current destination which it knew of—it was in the Atlantic Ocean, avowedly awaiting orders which would tell it where to go. It told the Coast Guard that it did not want the government vessel to come alongside or to come aboard and said it was leaving those waters and saw no need for the government to board the freighter. A check of American ports by the Coast Guard had failed to reveal any notice to any port such as that required of a foreign vessel of an intention to come into port. Further information obtained showed that the vessel had been anchored off Aruba two months earlier and had left without going into port. Ultimately, the Coast Guard decided to make an investigation of the vessel's papers, and although so advised, the ship gave no indication of consent thereto, whereupon the government vessel fired two bursts of three rounds each of 50 calibre fire over the bow of the freighter to cause it to heave to and compel it to permit the Coast Guard to come aboard for normal inspection of its papers. The freighter's captain did this under protest.

The Operational Intelligence Officer for the Coast Guard's Atlantic Area Command, Commander D. R. Herlihy, who supervised the actions of the Coast Guard cutter from his base on Governors Island in New York,

had a background of knowledge that for several years numerous drug smugglers and would-be smugglers have used a technique known as the "mother ship" technique. That involves a ship loaded with large quantities of Marijuana hovering off the United States coast to which small boats come out to get the Marijuana and take it ashore. Commander Herlihy informed the Coast Guard authorities in Washington that based on the ROONDIEP's appearance, locations, actions and statements to the Coast Guard cutter following the freighter, the ROONDIEP appeared to be involved in "mother ship" drug smuggling.

The facts and circumstances gave every justification for an investigatory stop of the freighter. The Coast Guard had a reasonable suspicion that those aboard the vessel were engaged in a conspiracy to smuggle contraband into the United States and were subject to the operation of United States laws. During the surveillance of the vessel, the government had concluded arrangements with the Panamanian authorities for their consent and authority to board the freighter on behalf of the government of Panama.

After the boarding, the Coast Guard officer in charge asked to be shown the freighter's registry papers and on inquiry was told that the freighter was not carrying any cargo. The Coast Guard officer went to the ROONDIEP's cargo hold and smelled Marijuana and saw in open view hundreds of bales filled with Marijuana. When asked thereafter what was in the hold, the freighter's captain replied that the Coast Guard officer knew what was there. The arrest of all seven people found aboard the ROONDIEP followed.

## II.

The Coast Guard had a reasonable suspicion that the ROONDIEP personnel were engaged in extraterritorial criminal plans to violate the federal narcotic laws.

14 U.S.C. § 89(a) expressly authorized the Coast Guard to inquire, examine, inspect, search, seize and arrest on the high seas to prevent, detect and suppress violations of United States laws. "For such purposes, commissioned, warrant and petty officers may at any time go on board of any vessel subject to the jurisdiction, or to the operation of any law, of the United States, address inquiries to those on board, examine ship's documents and papers, and examine, inspect, and *search the vessel* and use all necessary force to compel compliance". (Emphasis added).

The statute further provides "[w]hen from such inquiries, examination, inspection, or search it appears that a breach of the laws of the United States rendering a person liable to arrest is being, or has been committed, by any person, such person shall be arrested...."

This statute together with Panama's consent plainly authorized the Coast Guard to board the ROONDIEP and search its hold.

Section 89(a) has been interpreted by the Courts to permit the Coast Guard to stop and board any American flag vessel anywhere on the high seas, in the complete absence of suspicion of criminal activity. *United States v. Warren*, 578 F.2d 1058, 1064–65 (5th Cir. 1978) (*en banc*); *United States v. Odom*, 526 F.2d 339, 341–42 (5th Cir. 1976).

The statute also allows boarding of a foreign flag vessel. *United States v. Williams*, 617 F.2d 1063, 1076 (5th Cir. 1978) (*en banc*); *United States v. Dominguez*, 604 F.2d 304, 308 (4th Cir.), *cert. denied*, 444 U.S. 1014, 100 S.Ct. 664, 62 L.Ed.2d 644 (1979). It is well settled that an offense that occurs outside the United States, but that has an effect within the United States' sovereign territory, is subject to United States jurisdiction. *United States v. Bowman*, 260 U.S. 94, 98–99, 43 S.Ct. 39, 41, 67 L.Ed. 149 (1922). Thus, extraterritorial conspiracies to violate the federal narcotics laws have consistently been held to be offenses subject to the jurisdiction of the United States. *United States v. Williams*, 617 F.2d 1063 (5th Cir. 1980) (*en banc*); *United States v. Mann*, 615 F.2d 668 (5th Cir. 1980); *United States v. Perez-Herrera*, 610 F.2d 289 (5th Cir. 1980); *United States*

v. Postal, 589 F.2d 862 (5th Cir. 1979), cert. denied, 444 U.S. 832, 100 S.Ct. 61, 62 L.Ed.2d 40 (1979); United States v. Egan, 501 F.Supp. 1252 (S.D.N.Y.1980).

■ Accordingly, "a foreign vessel on the high seas becomes subject to the operation of the laws of the United States within the meaning of § 89(a) when those aboard are engaged in a conspiracy to violate federal narcotics statutes." United States v. Williams, supra, at 1076, citing United States v. Postal, supra.

Section 89(a) authorizes the Coast Guard to board a foreign flag vessel on the high seas when it has a "reasonable suspicion" that the vessel is involved in smuggling contraband into the United States:

> Thus, if the Coast Guard has a reasonable suspicion that a foreign vessel in international waters is engaged in smuggling, the Coast Guard must necessarily have reasonable grounds for suspecting the vessel is subject to the operation of American laws; section 89(a) would, therefore, permit the seizure of the vessel.

Williams, supra. 617 F.2d at 1076.

■ In view of the Coast Guard's reasonable suspicions, its boarding of the ROONDIEP was a constitutionally permissible investigatory stop. In an unbroken line of authority in land cases since Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), law enforcement officers are given "the power, indeed the obligation, to detain a person temporarily for the purpose of interrogating him if the officer reasonably suspects that the detainee has committed or is about to commit a crime." United States v. Oates, 560 F.2d 45, 58–59 (2d Cir. 1977). (footnote omitted).

### III.

In United States v. Brignoni-Ponce, 422 U.S. 873, 878, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607 (1975), the Supreme Court stated:

> The Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest. "[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person," and the Fourth Amendment requires that the seizure be "reasonable". As with other categories of police action subject to Fourth Amendment constraints, the reasonableness of such seizures depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers. (citations omitted).

Traditionally, courts, applying the warrant clause of the Fourth Amendment, have evaluated the reasonableness of seizures in terms of whether there exists "probable cause" for arrest. See United States v. Vasquez, 612 F.2d 1338, 1341 (2d Cir. 1979). The boarding of the ROONDIEP quite clearly constitutes a seizure, and the defendants contend that the probable cause standard should apply. Nevertheless, there are degrees of perception of the necessity for moving to seize the person, or in this case, the vessel. This is articulated in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968):

> Our evaluation of the proper balance that has to be struck in this type of case leads us to conclude that there must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. 392 U.S. at 27, 88 S.Ct. at 1883.

This "investigatory stop" exception has subsequently been expanded. In Adams v. Williams, 407 U.S. 143, 145–46, 92 S.Ct. 1921, 1922, 32 L.Ed.2d 612 (1972), another "stop and frisk" case, the Court stated:

> The Fourth Amendment does not require a policeman who lacks the precise level of

information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response. A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time. (citations omitted).

Finally, in *United States v. Brignoni-Ponce*, 422 U.S. 873, 881, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975), the Court stated that "because of the importance of the governmental interest at stake, the minimal intrusion of a brief stop, and the absence of practical alternatives for policing the border, we hold that when an officer's observations lead him reasonably to suspect that a particular vehicle may contain aliens who are illegally in the country, he may stop the car briefly and investigate the circumstances that provoke suspicion." The Court further held, however, that on the facts of that case, there was no reasonable suspicion to justify the search.

On this issue, the Second Circuit has stated that "[t]he constitutional standard of 'reasonableness' takes into account both governmental and private interests. The public interest is measured by examining the need for the stop, and the individual's interest is calculated by assessing the gravity of the intrusion suffered." *United States v. Vasquez*, 612 F.2d 1338, 1342 (2d Cir. 1979). Similarly, in *United States v. Price*, 599 F.2d 494, 500 (2d Cir. 1979), the Court stated that "[t]he need for a stop depends on factors such as the seriousness of the offense suspected, the consequences of delay on the part of the officers, and the likelihood of the detainee's involvement in the offense suspected."

Here, all three of these factors tipped decidedly in favor of making the stop. It is obvious that the suspected crime was exceptionally serious. It is equally obvious that if the Coast Guard had not stopped the ROONDIEP, but had merely continued to follow it, the ROONDIEP would have continued on its way, putting as much distance as it could between it and the United States Coast. The boarding in this case was an investigatory stop. Under the general test of balancing the government's interest in law enforcement against the privacy interests of the individual, the seizure of the freighter was reasonable. The United States clearly has "a vital interest" in preventing drug smuggling and apprehending prospective violators of the drug laws.

## IV.

■ In *United States v. Williams*, 617 F.2d 1063 (5th Cir. 1980) (*en banc*) the Court provided yet another justification for the seizure of vessels by the Coast Guard in circumstances such as those present here. There the Court examined the Coast Guard's constitutional authority to board and search vessels under the Customs' laws and under Article 22 of the Convention on the High Seas, and reasoning by analogy, concluded:

Section 89(a)'s provision permitting the seizure, in international waters, of a foreign vessel suspected to be involved in the violation of federal narcotics laws is at least as reasonable as the provisions for seizures of vessels set out in Section 1581 and article 22. Under the facts of the present case, the reasonable suspicion standard of Section 89(a) gave those aboard the PHGH the same degree of protection that article 22 gives those aboard vessels subject to seizure under that provision.... Section 89(a) obviously gave greater protection to the personal interests of those aboard the PHGH than Section 1581, which permits seizures without a modicum of suspicion, gives to the interests of those aboard vessels in customs waters. At the same time, this country's interest in seizing foreign vessels in international waters when the vessels are reasonably suspected to be involved in the violation of federal narcotics laws is clearly as strong as the interest in seizing unsuspicious vessels in customs

waters for customs checks. 617 F.2d at 1084.

Panama's consent provided the Coast Guard with a separate source of authority which was sufficient by itself to authorize the boarding and search of the ROONDIEP. *United States v. Williams, supra*, 617 F.2d at 1075, 1077; *United States v. Dominguez, supra*, 604 F.2d at 308. The permission granted by Panama on September 24, 1980 to board and search the ROONDIEP, and to seize it if contraband were found, was a "special arrangement" within the meaning of the relevant statutes, 19 U.S.C. § 1581(h) and § 1587(a), and authorized the Coast Guard to act as it did. Those statutes will be reviewed hereafter.

Article 35 of the Single Convention on Narcotic Drugs, 18 UST 1407, TIAS 6298, as amended by the 1972 Protocol, TIAS 8118, to which both the United States and Panama are parties and 22 U.S.C. § 2291(a), 19 U.S.C. § 1581 and 19 U.S.C. § 1587(a) work together to permit the Coast Guard to board a foreign flag vessel when it obtains permission from the flag state.

The Single Convention obligates the United States to cooperate with other countries to suppress illicit production and trade in drugs. Article 35 of the Convention specifically calls for international cooperation and coordination at the national level to prevent and repress drug trafficking.[1]

22 U.S.C. § 2291(a) authorizes the President to conclude the kind of international agreements envisioned by the Single Convention. The section permits him both to conclude agreements with and also furnish assistance to, foreign countries for the purpose of controlling illegal drug trafficking.[2]

19 U.S.C. § 1581(h) and § 1587(a) provide, in turn, that officers of the customs, who include Coast Guard officers, may board a foreign flag vessel pursuant to a "special arrangement" between the United States and the foreign nation. In boarding, they are entitled to take all action necessary to enforce United States law. 19 U.S.C. § 1581(a), § 1581(e), § 1581(h), § 1587(a).[3]

---

**1.** Article 35 provides in pertinent part as follows:

Having due regard to their constitutional, legal and administrative systems, the Parties shall:

(a) Make arrangements at the national level for coordination of preventive and repressive action against the illicit traffic; to this end they may usefully designate an appropriate agency responsible for such co-ordination;

(b) Assist each other in the campaign against the illicit traffic in narcotic drugs;

(c) Co-operate closely with each other and with the competent international organizations of which they are members with a view to maintaining a co-ordinated campaign against the illicit traffic;

(d) Ensure that international co-operation between the appropriate agencies be conducted in an expeditious manner ...

**2.** 22 U.S.C. § 2291(a) provides in part:

It is the sense of the Congress that effective international cooperation is necessary to put an end to the illicit production, smuggling, trafficking in, and abuse of dangerous drugs. In order to promote such cooperation, the President is authorized to conclude agreements with other countries to facilitate control of the production, processing, transportation, and distribution of narcotic analgesics, including opium and its derivatives, other narcotic drugs and psychotropics, and other controlled substances as defined in the Comprehensive Drug Abuse Prevention and Control Act of 1970. Notwithstanding any other provision of law, the President is authorized to furnish assistance to any country or international organization, on such terms and conditions as he may determine, for the control of the production of, processing of, smuggling of, and traffic in, narcotic and psychotropic drugs.

**3.** 19 U.S.C. § 1581 provides in part:

(a) Any officer of the customs may at any time go on board of any vessel ... at any place in the United States or within the customs waters or ... at any other authorized place ... and examine, inspect, and search the vessel ... and every part thereof and any person, trunk, package, or cargo on board, and to this end may *hail and stop* such vessel ... and use all necessary force to compel compliance ...

(e) If upon the examination of any vessel ... it shall appear that a breach of the laws of the United States is being or has been committed so as to render such vessel ... or the merchandise, or any part thereof, on board of, or brought into the United States by, such vessel ... liable to forfeiture or to secure any fine or penalty, the same shall be seized and any person who has engaged in such breach shall be arrested ...

(h) The provisions of this section shall not be construed to authorize or require any officer

When Panama gave the Coast Guard permission to board the ROONDIEP "permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974). That permission negated the need for a warrant.

## V.

The defendants initially questioned the search of the cargo hold as improper under the Fourth Amendment. However, the sole questions reserved by defendants relate to the boarding of the vessel, and Panama's consent thereto.

It may nonetheless be noted that there was no merit to the objection to the search of the cargo hold.

The Supreme Court has held repeatedly in the last few years that evidence may not be excluded under the Fourth Amendment unless an unlawful search or seizure violated a defendant's own constitutional rights. *United States v. Salvucci*, 448 U.S. 83, 87, 100 S.Ct. 2547, 2550, 65 L.Ed.2d 619 (U.S.1980), *United States v. Payner*, 447 U.S. 727, 733, 100 S.Ct. 2439, 2445, 65 L.Ed.2d 468 (U.S.1980); *Rawlings v. Kentucky*, 448 U.S. 98, 102, 100 S.Ct. 2556, 2560, 65 L.Ed.2d 633 (U.S.1980); *Rakas v. Illinois*, 439 U.S. 128, 133–40, 99 S.Ct. 421, 424, 58 L.Ed.2d 387 (1978).

In *Salvucci, supra*, the Court abandoned the automatic standing rule, and specified that in order to determine whether a defendant has standing, a Court must assess not merely whether the defendant had a possessory interest in the items seized, but whether he had an expectation of privacy in the area searched. (448 U.S. 83, 87, 100 S.Ct. 2547, 2550.)

■ The defendants in the instant case totally fail to meet either test. First, none of the defendants has asserted any possessory or other proprietary interest in either the vessel ROONDIEP or its cargo. Since they have claimed no property interest in the Marijuana, they cannot claim to be aggrieved in any way by its seizure.

Second, none of the defendants has demonstrated a reasonable expectation of privacy in the hold of the ROONDIEP.

Even if each of the four defendants was a crew member on the ROONDIEP, that fact does not create any reasonable expectation of privacy in the ROONDIEP's cargo hold. *United States v. Williams, supra*, 617 F.2d at 1084.

■ It is well established that a ship generally has a lesser expectation of privacy than a house or office. A crewman on a vessel may well have an expectation of privacy in his living quarters, but his mere presence upon the vessel does not create a constitutional right to protection from searches by law enforcement officers anywhere else on the vessel. A crewman may fairly be likened to the conductor of a train on an overnight journey who may well have an expectation of privacy in the sleeping car to which he has been assigned quarters, but who could hardly allege privacy rights in the baggage car.

of the United States to enforce any law of the United States upon the high seas upon *a foreign vessel* in contravention of any treaty with a foreign government enabling or permitting the authorities of the United States to board, examine, search, seize, or otherwise to enforce *upon said vessel upon the high seas* the laws of the United States *except as* such authorities are or may otherwise be enabled or *permitted* under special arrangement with such foreign government. (Emphasis supplied)

19 U.S.C. § 1587(a) provides in part:

Any ... vessel ... which, being *a foreign vessel* to which subsection (h) of section 1581 of this title applies, *is permitted* by special arrangement with a foreign government *to be so examined without the customs waters of the United States*, may at any time be *boarded* and *examined* by any officer of the customs, and the provisions of said section 1581 shall apply thereto ... *It shall be presumed* that any merchandise (sea stores excepted), the *importation of which* into the United States *is prohibited*, or which consists of any spirits, wines, or other alcoholic liquors, so found, or discovered to have been, on board thereof, *is destined to the United States*. (Emphasis supplied)

The Coast Guard had statutory authorization to search the ROONDIEP's cargo hold under both 14 U.S.C. § 89(a), and 19 U.S.C. §§ 1581(h) and 1587(a), as well as authorization from Panama.

In *Williams, cit. supra,* the Fifth Circuit ruled *en banc* that a Coast Guard search under § 89(a) of any "private" area of a ship's *hold* satisfied the Fourth Amendment when there is "reasonable suspicion that contraband or evidence of criminal activity will be found." Expectations of privacy for the hold of a cargo ship available for hire are minimal.

## VI.

Defendants contend finally that the indictment should have been dismissed or, alternatively, all physical evidence and statements should have been suppressed on the ground that the Coast Guard knowingly violated the scope of its authority as set forth in 22 U.S.C. § 2291(c)(1) in seizing the ROONDIEP and interrogating her crew.

22 U.S.C. § 2291(c)(1) has absolutely no bearing on this case, as both the words of the statute and its legislative history conclusively show. Section 2291(c)(1) provides:

> Notwithstanding any other provision of law, no officer or employee of the United States may engage or participate in any direct police arrest action *in any foreign country* with respect to narcotics control efforts. No such officer or employee may interrogate or be present during the interrogation of any United States person arrested *in any foreign country* with respect to narcotics control efforts without the written consent of such person. The provisions of this paragraph shall not apply to the activities of the United States Armed Forces in carrying out their responsibilities under applicable Status of Forces arrangements. (Emphasis supplied).

Relying on the doctrine of international law known as the "law of the flag", defendants contend that since "a merchant ship ... 'is deemed to be part of the territory of that sovereignty [whose flag it flies] ...,'" *Lauritzen v. Larsen,* 345 U.S. 571, 585, 73

S.Ct. 921, 929, 97 L.Ed. 1254 (1953), the Coast Guard was prohibited by § 2291(c)(1) from acting as agents for foreign governments (Panama in this case) in arresting suspected narcotics violators on foreign territory. In support of their argument, they point to an internal Coast Guard memorandum which, they say, shows that the Coast Guard was aware of possible applications of 22 U.S.C. § 2291 to cases such as this but that they chose to ignore them. Moreover, they assert that the legislative history of § 2291(c)(1) reflects an explicit congressional intent that United States government officials not act as agents for foreign governments in arresting suspected narcotics violators.

■ Defendants' argument must be rejected; it both misconstrues the "law of the flag" and misinterprets the legislative history of § 2291(c)(1). The "law of the flag" doctrine does not hold that for all purposes a ship is part of the territory of the country whose flag it flies. In *Cunard S.S. Co. v. Mellon,* 262 U.S. 100, 43 S.Ct. 504, 67 L.Ed. 894 (1923), the Supreme Court held, *inter alia,* that American ships outside territorial waters were not part of the territory of the United States for purposes of the National Prohibition Act. The Court held that, as used in the Act, the term "territory" "means the regional areas—of land and adjacent waters—over which the United States claims and exercises dominion and control as a sovereign power. The immediate context and the purpose of the entire section show that the term is used in a physical and not a metaphorical sense ..." 262 U.S. at 122, 43 S.Ct. at 506. In response to the argument that such ships are part of the territory of the United States under the "law of the flag," the Court stated:

> [T]he statement [is] sometimes made that a merchant ship is part of the territory of the country whose flag she flies. But this, as has been aptly observed, is a figure of speech, a metaphor. The jurisdiction which it is intended to describe arises out of the nationality of the ship, as established by her domicile, registry and use of the flag, and partakes more of

the characteristics of personal than of territorial sovereignty. *Id.*, at 123, 43 S.Ct. at 507. ¯(citations omitted).

■■■ The language and legislative history of § 2291(c)(1) clearly indicate that it was not intended to apply to actions such as this. The language of the section prohibits participation by United States' officers and employees in "any direct police arrest action *in any foreign country*"; it makes no reference to a vessel on the high seas or even to foreign "territory".

Moreover, the legislative history makes clear that the provision was intended to apply to DEA employees, working with internal police forces *in foreign lands* in drug control activities, and not to the Coast Guard operating in international waters. The Report of the House International Relations Committee states:

> In adopting this provision the committee seeks to insure that U.S. narcotics control efforts abroad are conducted in such a manner as to avoid involvement by U. S. personnel in foreign police operations where violence or the use of force could reasonably be anticipated. By "arrest actions" the committee means any police action which, under normal circumstances, would involve the arrest of individuals whether or not arrests, in fact, are actually made. The committee intends that the U. S. Ambassador in any *country* where U. S. narcotics control activities are being carried out shall exercise close supervision over such activities to insure that U. S. personnel do not become involved in sensitive, *internal law* enforcement operations which could adversely affect U. S. relations with that *country.* (Emphasis supplied)

H.R.Rep.No.1144, 94th Cong. 2d Sess. 54–55, *reprinted in* [1976] U.S.Code Cong. & Ad.News 1378, 1430–31.

The 1978 Report of the Senate Foreign Relations Committee, explaining a proposed amendment to subsection (c)(1), later adopted, which prohibits a United States employee from interrogating any American arrested *in a foreign country* without that person's written consent, also indicates that the provision was directed to DEA agents operating abroad. In relevant part, the Report states:

> The committee is concerned with reports that agents of the *Drug Enforcement Administration* in their overseas work may have violated the Mansfield amendment which prohibits any U. S. agent from participating in any direct police arrest action. In light of reports alleging *DEA* violations of the Mansfield provision, it is the committee's view that this provision is needed to further limit *DEA's* activities to avoid involvement of U. S. police in sensitive foreign internal law enforcement operations. Should these reports continue the committee will consider additional remedial legislation. The Committee feels that *DEA's* primary emphasis overseas should be on intelligence gathering and analysis, especially intelligence gathering related to organizations involved in major drug trafficking.
>
> The committee notes that a recent GAO report (GGD–78–45, March 29, 1978), requested by the committee, pointed out that *DEA* agents are not targeting on major traffickers. In 1977 only 14 percent of foreign cooperative arrests in South America were major traffickers. The committee also notes that in this report that several instances were cited, in which DEA agents were involved in South American police actions, since enactment of the Mansfield amendment in 1976, that could easily have led to violations of the amendment. S.Rep.No.841, 96th Cong., 2d Sess., 13, *reprinted in* [1978] U.S.Code Cong. & Ad.News 1833, 1845 (Emphasis supplied).

Finally, the original sponsor of the provision, Senator Mansfield, in remarks on the Senate floor, emphasized the concerns that *DEA actions* in foreign lands resulted in the mistreatment of United States citizens charged with drug offenses and improperly drew us into the internal affairs of other countries:

> One side of the issue—the one which the press has exposed—concerns the mis-

**490**

treatment of American citizens overseas. The other side of the issue—the one which the press has largely overlooked—concerns the U. S. effort to encourage other countries to join us in the "war on drugs" and drug peddlers, be they American Citizens, Mexican citizens, or somebody else's citizens.

Mr. President, I do not believe it takes much imagination to discern a cause-and-effect relationship in this situation and the existence of that relationship leads me to the conclusion that the United States itself bears some of the responsibility for the mistreatment of its own citizens jailed abroad on narcotics charges. In the case of Mexico, for example, the responsibility we bear derives from the severe pressure we have exerted on the Mexican Government to beef up its drug enforcement program—a program which we have helped to underwrite to the tune of $18 million, with an additional $8 million requested for the 15-month period ending September 30, 1976.

Before I go further, Mr. President, let me express the general concern that I have about this type of bilateral assistance. It is the type of assistance that inevitably draws us deeper and deeper into the internal affairs of another country. 121 Cong. Rec. 38994 (1975).

### VII.

The Fourth Amendment rights of the defendants were not violated by the boarding and seizure and Panama's consent was valid and effective.

SO ORDERED.