UNITED STATES of America, Plaintiff,

v.

George LAYNE, et al., Defendants.

No. 84–417–CR–EPS.

United States District Court,
S.D. Florida,
Miami Division.

Dec. 5, 1984.

Jeffrey Fisher, Asst. U.S. Atty., Miami, Fla., for plaintiff.

Michael H. Bloom, Miami, Fla., for Layne.

Lance Stelzer, Miami, Fla., for Lall.

Jerry W. Burford, Miami, Fla., for Casanova.

Lawrence M. Kasen, Miami, Fla., for Hodgson.

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANT LAYNE'S MOTION TO DISMISS AND/OR SUPPRESS

SPELLMAN, District Judge.

Defendants have been charged with conspiracy to possess and possession with intent to distribute marijuana while in the customs waters of the United States, in violation of 21 U.S.C. Sec. 955a(c). Defendant, George Layne, claims that this statute is unconstitutional, violative of international law and vague. The latter issue is frivolous and will not be discussed. Layne has therefore filed a pre-trial Motion, pursuant to Fed.R.Crim.P. 12, to Dismiss the Indict-ment and/or to Suppress all tangible evidence seized by the Government and all statements made by the Defendant. Based on the following reasons, however, this Court concludes that the Motion must be denied.[1]

THE FACTS:

On November 27, 1984 this Court held an evidentiary hearing at which Lt. Commander James Sether, Lt. Steven Newell[2] and Defendant George Layne testified. At counsels' request, this Court also viewed the Coast Guard videotape documenting the pursuit, stop, and arrest of the Defendants. After considering all of the evidence, this Court finds the following facts to be true.

While on patrol in the Yucatan Channel between Mexico and Cuba on the night of June 18, 1984, the Coast Guard Cutter DAUNTLESS spotted the motor vessel CRAMAY on a course headed toward the United States. When the DAUNTLESS was within 1,000 yards of the CRAMAY it attempted to make contact with the vessel. At this time, the Coast Guard noticed that the CRAMAY was riding low in the water, indicating that it contained cargo. As soon as the DAUNTLESS made contact, the CRAMAY altered its course heading north.

After making contact with the CRAMAY, Lt. Commander James Sether spoke with Defendant Layne by radio. Layne stated that the vessel was of Turks and Caicos nationality, that its next port of call was Holohit Mexico, and that it was carrying no cargo. Layne refused to permit the Coast Guard to board the vessel to verify the vessel's nationality.

At 9:50 a.m., the following morning, Lt. Commander Sether received permission from his superiors in Miami and Washington, D.C. to stop and board the CRA-

---

**1.** This ruling applies as well to the co-defendants; on August 15, 1984, this Court, in open Court, advised counsel that it was only necessary for counsel to file one motion attacking jurisdiction.

**2.** After the close of the evidence in this case but before closing arguments, Lt. Newell indicated to the Court that he had been incorrect in certain testimony. This Court, therefore, while the jury was deliberating, heard further testimony of Lt. Newell. This testimony related to his first boarding the CRAMAY and smelling marijuana. This Court is of the opinion, however, that this testimony in no way affects this Court's conclusion that the Motion to Dismiss and/or Suppress must be denied.

MAY pursuant to United States-United Kingdom agreement (the Turks and Caicos are British possessions). Sether thereafter communicated his authority to Layne and ordered Layne to stop his vessel. Layne refused and the CRAMAY had to be stopped by force. At 5:40 p.m. the CRAMAY was boarded and 35,000 pounds of marijuana was discovered in the vessel's main hold.

### 1. Constitutionality

■ Defendant asserts that 21 U.S.C. Sec. 955a(c) "is unconstitutional *per se* and ... as applied in that the Congress of the United States seeks to punish actions of foreign nationals in or on foreign vessels approximately 1,000 miles from the territorial waters of the United States." This argument, however, lacks merit.

It is beyond dispute that Congress has the power to legislate extraterritorially and clearly intended Section 955 to have extraterritorial application. *See United States v. Flores*, 289 U.S. 137, 53 S.Ct. 580, 77 L.Ed. 1086 (1933). Indeed, the fifth circuit, in *United States v. Baker*, 609 F.2d 134, 137 (5th Cir.1980), noted: "The power to control efforts to introduce illicit drugs into the United States from the high seas and foreign nations is a necessary incident to eradicate all illegal drug trafficking."

This Court is therefore of the opinion that Sec. 955a(c) is constitutional. In fact the constitutionality of various provisions of 21 U.S.C. Sec. 955 has already been upheld by the eleventh circuit. *See United States v. Luis-Gonzalez*, 719 F.2d 1539 (11th Cir.1983); *United States v. Marino-Garcia*, 679 F.2d 1373 (11th Cir.1982). Thus this Court now turns to Defendant's second assertion, that the statute cannot be constitutionally applied to the circumstances in this case or, in other words, the United States lacks jurisdiction over the cause.

### 2. Jurisdiction

Title 21 of the United States Code, Section 955a(c) provides that "[i]t is unlawful for any person on board any vessel within the customs waters of the United States to knowingly or intentionally manufacture or distribute, or possess with intent to manufacture or distribute, a controlled substance." Because it is not disputed that marijuana is a controlled substance, and that the CRAMAY was in international waters at the time the marijuana was seized and the Defendant arrested, the sole legal issue that must be addressed is whether or not the CRAMAY was within the customs waters of the United States within the meaning of 28 U.S.C. Sec. 955a(c).

■ Section 955b(a) adopts the 19 U.S.C. Sec. 1401(j) definition of "customs waters" which provides that:

The term "customs waters" means, in the case of a foreign vessel subject to a treaty or other arrangement between a foreign government and the United States enabling or permitting the authorities of the United States to board, examine, search, seize, or otherwise to enforce upon such vessel upon the high seas the laws of the United States, the waters within such distance of the coast of the United States as the said authorities are or may be so enabled or permitted by such treaty or arrangement and, in the case of every other vessel, the waters within four leagues of the coast of the United States.

On November 13, 1981, the United States entered into an "arrangement" within the meaning of Sec. 1401(j) with Great Britain respecting the interdiction of vessels suspected of carrying illicit drugs. *See* TIAS 10296. This agreement provides, in pertinent part, that Great Britain

will not object to the boarding by the authorities of the United States, outside the limits of the territorial sea and contiguous zone of the United States and within the areas described by paragraph 9 below, of private vessels under the British flag in any case in which those authorities reasonably believe the vessel has on board a cargo of drugs for importation into the United States...

Recent appellate decisions have held that the term "arrangement" includes authorization similar to that given in the case at

bar by the United Kingdom. *See United States v. Green*, 671 F.2d 46, 49–52 (1st Cir.1982); *United States v. Dominguez*, 604 F.2d 304, 308 (4th Cir.1979). In addition, *compare United States v. Sandoval-Pallarez*, No. 84–55–CR–SMA, Oral Findings, dated April 23, 1984 (consent by the Government of Panama is all that is necessary to support a 1401(j) definition of customs waters) *with United States v. Santa-Lara*, No. 84–330–CR–ALH, Order Dismissing Indictment, issued November 16, 1984 (Extending "customs waters" definition "to any point in international waters anywhere in the world because of an informal radio or telephone communication with a foreign government is ... outrageous.").

In *Dominguez*, a Coast Guard Cutter asked for and received oral permission from the Bahamian government to board and search the SEA CRUST which flew a Bahamian flag. The fourth circuit held that this permission, confirmed in writing, to board and seize the vessel and to arrest its crew was a "special arrangement" within the meaning of the Anti-Smuggling Act of 1935, 19 U.S.C. Sec. 1401(m). This statute first defined "customs waters," and this definition is the genesis of the current definition.[3]

The facts in this case justify a finding of jurisdiction even more than the facts in *Dominguez*. Here there is no informal oral conversation but a formal written agreement entered into between the United States and Great Britain. And, after viewing the video tape and considering the testimony of Lt. Commander Sether and Lt. Newell, this Court is of the opinion that the Coast Guard could reasonably believe that the CRAMAY had on board a cargo of drugs for importation into the United States.

When first spotted by the Coast Guard, the CRAMAY was headed toward the United States. The CRAMAY was a fishing vessel yet fishing equipment was almost undetectable. The CRAMAY appeared to be freshly and carelessly repainted and the CRAMAY also appeared to be riding low in the water, indicating that it contained cargo.

It appeared that the "C" was originally a "G"; a vessel named GRAMAY was on a Coast Guard "hit" list.[4] Based on Defendant Layne's statement that the vessel was carrying no cargo, this Court finds, for the purpose of the pending motion to dismiss and/or suppress, that the Coast Guard could reasonably believe that the vessel was engaged in an illegal activity and thus subject to boarding and search[5] under the laws of the United States and the United States-Great Britain agreement. This Court clearly has jurisdiction under Sec. 955a(c), that statute is constitutional and, additionally, there was no violation of international law. *See United States v. Williams*, 617 F.2d 1063 (5th Cir.1980) (*en banc*) (Coast Guard, under Right of Approach, has right to sail up to unidentified vessel to ascertain nationality).

With regard to jurisdiction over the person, although this claim was not made, paragraph 5 of the United States-United Kingdom agreement provides:

The Government of the United Kingdom may, within 30 days of the vessel's entry into port, object to the prosecution of any United Kingdom national found on board the vessel, and the Government of the United States shall thereupon release such person. The Government of the United Kingdom agree that they will not otherwise object to the prosecution of any person found on board the vessel.

---

**3.** The *Dominguez* interpretation of the Anti-Smuggling Act is supported by its legislative history. *See* S.Rep. No. 1036, 74th Cong., 1st Sess. 9 (1935).

**4.** The Coast Guard "hit" list had the CRAMAY suspected of major smuggling.

**5.** This Court finds Lt. Newell's testimony, that he detected the smell of marijuana on board the CRAMAY, to be credible. Even so, in view of the overwhelming evidence and evasive actions of the CRAMAY, there is no need to rely on this fact to "reasonably believe the vessel has on board a cargo of drugs for importation into the United States..."

There being no claim that the United Kingdom objected to Layne's prosecution and this Court being aware of no objection, there is no bar to this Court's assertion of jurisdiction over the Defendant Layne, even if Layne had raised this claim.

Conclusion:

Thus, for all the foregoing reasons, Defendant George Layne's Motion to Dismiss and/or Suppress [6] is denied.[7]

---

6. Especially with regard to the Motion to Suppress, this Court orally ruled and made findings of fact in the record. Those findings are, to the extent applicable, made a part of this Memorandum Opinion and Order as further support for the conclusions reached.

7. This Court is of the opinion that the question of whether or not the United States-Great Britain Agreement did in fact confer jurisdiction over the stop, search and seizure of the CRAMAY is a question of law. Since this Court has ruled that there was a reasonable belief that the CRAMAY had "on board a cargo of drugs for importation into the United States in violation of the laws of the United States," the only issue that was litigated with respect to "customs waters" is whether the seizure occurred within the areas set by paragraph 9 of the Agreement: namely, "the Gulf of Mexico, the Caribbean Sea, that portion of the Atlantic Ocean West of longitude 55° West and South of latitude 30° North and all other areas within 150 miles of the Atlantic coast of the United States."

This fact, along with the other essential elements of the offense, is all that the United States Government need prove beyond and to the exclusion of a reasonable doubt to win a conviction.