**UNITED STATES of America**

v.

**Thomas George WHITMORE, James Crain Bradley, Garret Dillon, Defendants.**

**Crim. No. 81–00012–B.**

United States District Court, D. Maine.

April 9, 1982.

William H. Browder, Jr., Asst. U. S. Atty., Bangor, Maine, for the U. S.

Michael Washor, Washor & Washor, New York City, for Dillon.

Robert I. Kalina, New York City, for Bradley.

Marshall A. Stern, Bangor, Maine, for Whitmore.

## MEMORANDUM OPINION ON MOTIONS TO SUPPRESS

CYR, District Judge.

On September 10, 1981, defendants Thomas George Whitmore, James Crain Bradley and Garret Robert Dillon were charged in a three-count indictment with: (1) conspiracy to possess, with intent to distribute, approximately five and one-half tons of marijuana in violation of 21 U.S.C. §§ 841 & 841(b)(6); (2) possession of, with intent to distribute, approximately five and one-half tons of marijuana in violation of 21 U.S.C. §§ 841(a)(1) & 841(b)(6), and 18 U.S.C. § 2; and (3) knowingly permitting a vessel within the territorial waters of the United States to be used as a place of resort for persons conspiring and preparing to commit an offense against the United States in violation of 18 U.S.C. § 2274.

Presently before the court are (1) the motion to suppress filed October 22, 1981 by defendants Bradley and Dillon, joined by defendant Whitmore on November 13, 1981, and (2) the motion to suppress filed by defendant Whitmore on November 13, 1981. These motions seek the suppression of all evidence obtained from the vessel *Relentless* on or about July 12, 1981 allegedly in violation of the Fourth Amendment to the Constitution of the United States. An evidentiary hearing has been held, the issues have been comprehensively briefed and argued by counsel, and the following memorandum opinion contains the findings of facts and conclusions of law required by Federal Rule of Criminal Procedure 12(e).

## I

## THE FACTS

On Sunday, July 12, 1981, the Coast Guard cutter *Point Hannon* was on routine law-enforcement and search-and-rescue pa-

trol in East Penobscot Bay about one-half mile south of Seal Island, Maine. As the cutter sat drifting off the coast at about 3:50 p. m., Master Chief Petty Officer Leslie C. Parritt, Jr., while fishing with 6 of his 10 crewmen, spotted a sail on the horizon, between 5 and 10 (perhaps 12) miles away, outside U. S. territorial waters. Considering it unusual for a sailing vessel to be approaching the coast of Maine from the open sea, Commander Parritt instructed the navigator of the *Point Hannon*, Petty Officer William G. Smith, to keep an eye on the sailboat. At this point in time Commander Parritt determined that he would stop and board the sailboat.[1]

Smith watched the sailboat for about two hours and determined that it was heading downwind almost directly north-northeasterly toward the coast of Maine and the *Point Hannon*.

The sailboat closed to within 2 or 3 miles of the *Point Hannon* by approximately 5:00 to 5:30 p. m., at which time Commander Parritt ordered the *Point Hannon* underway to investigate and board the sailboat.

By the time the vessels had closed to within about 1 mile, Smith could read through his binoculars—"*Relentless*", "Delaware", and "DL4264K" on the sailing vessel, which was flying an American flag. The *Relentless* appeared to be a 46-foot, sloop-rigged, fiberglass racing boat painted three shades of blue, with the darkest shade (almost black) at the bottom, a lighter shade extending upward from the normal water line, and the lightest (almost sky) blue shade topmost.

As the *Point Hannon* closed to within about three-quarters of a mile, the *Relentless* turned 180 degrees to the south or a

few degrees west of south, away from the *Point Hannon*, from its original heading directly downwind to directly upwind.[2] Parritt and Smith interpreted the change of heading as an effort to flee. Defendants argue that the reversal in direction was due to the fact that the *Relentless* was approaching an area marked "danger" on the nautical chart carried aboard the *Relentless*.

Commander Parritt ordered full power applied to the *Point Hannon*.

Within from three to five minutes, as the *Point Hannon* approached to within one-half mile or 1,000 yards, the *Relentless* again reversed its heading, turning back toward the *Point Hannon*, dropping its sails and continuing underway in its original north-northeasterly direction under auxiliary power. At the time the *Relentless* dropped sail it was between one and one-half and two and one-half miles off Seal Island and there was a five to ten-knot breeze.

After the *Relentless* turned the second time, through his binoculars Smith saw the defendants James C. Bradley and Garret Dillon in the cockpit of the *Relentless*. As the *Point Hannon* came closer, Smith considered it unusual, in light of his prior experience, that the two men aboard the *Relentless* did not wave or call the cutter on their radio to inquire if there was anything the coastguardsmen wanted. On the other hand, the coastguardsmen did not wave or attempt to contact the *Relentless* at the time.

As the *Point Hannon* approached to within about 200 yards of the *Relentless*, Smith and Parritt noticed that it was sitting fairly low in the water, even for a racing boat designed to ride low in the water,[3] and that

---

1. Commander Parritt testified that it is his standard practice on routine patrol to board one or two vessels a day and in particular to board any vessel approaching the coast from the open sea. Although the *Point Hannon* has not always stopped vessels approaching from the open sea and it is not unusual in July for sailboats to be in the area in which the *Relentless* was observed, the *coarse* of the *Relentless* was considered unusual and the *Point Hannon* did customarily stop sailboats approaching the coast from the open sea.

2. Turning into the wind is one method of stopping a sailboat running downwind.

3. Smith testified that, at the time of the boarding of the *Relentless*, the water came almost up to the top of the darkest portion of the hull (Tr. 123), which would seem somewhat inconsistent with his earlier testimony that the *Relentless* was "riding low," since he also testified that the darkest blue paint came up to the normal water line (Tr. 39). Officer Smith's basis for identifying where the normal water line is on the *Relentless* is not clear from the record. It

it was not bobbing around much, despite the fact that a small, fiberglass sailboat is likely to bob considerably even in the light two-foot swells running that day. Smith concluded that the *Relentless* was probably carrying a lot of ballast.

As the *Point Hannon* closed to within about 100 or 200 yards of the *Relentless*, Commander Parritt mustered a boarding party. The *Point Hannon* made a port turn around the *Relentless*, pulled astern of it at a distance of from 50 to 150 yards, and lowered the 14-foot rubber boarding launch from the port side. The blue light on the *Point Hannon* had been activated by the time the boarding party, consisting of Petty Officer Smith and First Class Petty Officer Vernon Shay, pulled along the starboard side of the *Relentless*, which was continuing underway at five or six knots. Shay testified that as the boarding launch approached to within about eight or ten feet of the *Relentless* he could smell what he believed from his prior experience and training to be marijuana. Smith called to the men on the *Relentless*: "We're Coast Guard law enforcement officers and we intend to board your boat." (Tr. 75, 137). Defendant Bradley, who was in the cockpit on the starboard side of the *Relentless* leaning over the rail facing the boarding launch, responded: "Is this a safety boarding?" Holding up life jackets and other safety equipment, Bradley continued: "I have all my safety equipment; here are my life preservers. I've got my flares." (Tr. 23, 76, 138). Either Smith or Shay responded: "We are coming aboard to enforce all U. S. law." Bradley then asked whether the men were making a customs boarding. Smith and Shay repeated that they were boarding to inspect for com-

pliance with all U. S. laws. Bradley continued to ask questions regarding the reasons for the boarding and insisted that there was no need for any type of boarding.

During these verbal exchanges between the coastguardsmen and defendant Bradley, the *Relentless* continued underway at 5 or 6 knots. When it became apparent to Smith that the *Relentless* was not going to stop without a show of force, he picked up a shotgun from inside the boarding launch and displayed it in front of him at a 45-degree angle with the muzzle over his left shoulder, stating: "Heave to, we're coming aboard." (Tr. 79).[4] At this point Bradley said: "The automatic pilot's on; I don't have control of the boat." Smith responded: "Shut down your engines; we're coming aboard!" Bradley shut down the engines and the *Relentless* came to a stop.

As Shay climbed aboard the *Relentless*, Smith handed him the shotgun and the boarding kit containing drug-testing equipment.[5] Smith climbed aboard and immediately detected a very strong odor of what he believed was unburned marijuana.[6] Smith testified that he had "a strong suspicion that there was marijuana on board that vessel once [he] had boarded it." (Tr. 84).

Introducing himself and Shay as federal law enforcement officers, Smith again stated that the boarding was for the purpose of examining the vessel for compliance with all U. S. laws and regulations. Smith asked to speak with the skipper. Receiving no response, he repeated the question and again got no response. Smith asked: "Then neither one of you admits to being

---

seems likely that the *Relentless* would ride lower in the water while underway. Or perhaps Smith misspoke when he said that the water was almost to the top of the darkest portion of the hull at the time of the boarding. In any event, the court discounts any such discrepancy in Smith's testimony in light of the repeated and convincing testimony given by both Smith and Parritt that the *Relentless* was riding low in the water (Tr. 15, 46, 47, 157).

4. Coast Guard policy at the time required either a shotgun or an M–16, in addition to sidearms, on all boardings.

5. Smith testified that all Coast Guard units of which he was aware include drug-testing equipment in their boarding kits.

6. As Shay and Smith climbed aboard the *Relentless*, Commander Parritt, still aboard the *Point Hannon*, observed something being thrown overboard from the *Relentless* and sinking into the water. This information does not appear to have been conveyed to the boarding party.

the operator of the boat;" to which both responded: "No".

Smith next asked to see a certificate of number.[7] Bradley said: "I don't think we have one on board." (Tr. 84). Smith asked Bradley whether he was sure he didn't have a certificate. Bradley answered: "Well, maybe. I'll go below and have a look." (Tr. 29, 86). Bradley proceeded belowdecks by climbing down a ladder at the front of the cockpit. From on deck, Smith could see a purple curtain hanging belowdecks, just beyond the ladder. Smith saw Bradley look behind the curtain briefly, then walk off to his left toward an area in which was located, Smith later learned, a chart table.

Both Smith and Shay were wearing hipholstered sidearms in open view. Throughout the boarding, Shay held the shotgun at port arms. While Bradley was belowdecks, Smith loaded and reholstered his sidearm.

Within about two or three minutes after the boarding of the *Relentless*, Commander Parritt called from the *Point Hannon* to inquire whether Smith and Shay were having problems. Shay responded that they were not getting any cooperation and that he had detected the odor of marijuana. Having observed the difficulties encountered by his men in boarding the *Relentless*, Parritt had already dispatched a third coastguardsman, Machinery Technician Pate, to the *Relentless*. Pate was on his way to the *Relentless* while the radio communications between Parritt and Shay took place. Pate came aboard the *Relentless* while Bradley was still belowdecks.

When Bradley came back on deck he stated that he could not find the certificate. Smith responded: "Then I guess I'll have to go below and look for it; and this time you come with me." (Tr. 30, 86). As he descended behind Bradley, Smith noticed that the smell of marijuana became even stronger. Once below, Bradley started to walk toward the purple curtain, but stopped before reaching it and turned away toward the chart table. Smith said: "Open that curtain." (Tr. at 88). Bradley replied: "Okay, but you won't like what you'll see." When Bradley opened the curtain, Smith immediately saw defendant Thomas G. Whitmore standing in front of numerous large burlap bales stacked in a compartment designed for use as the sleeping area.

Smith ordered Whitmore and Bradley on deck and shouted to Shay, at the head of the ladder, that he had discovered some bales from which he detected a strong odor of marijuana. Smith entered the compartment behind the curtain and began counting out loud the number of bales, stopping at 14, but observing that there were bales crammed throughout the compartment.

Smith returned on deck and ordered the defendants to open the storage compartments located under the seats in the cockpit, each of which was found to contain more bales of the type found belowdecks.

---

7. A certificate of number is a pocket-size [2½ by 3½ inches, *see* 33 C.F.R. § 174.25 (1980) ] certificate issued either by a state having a numbering system approved by the Coast Guard or directly by the Coast Guard. 46 U.S.C. §§ 1467, 1469 (1975). The certificate contains the number which must be obtained for any undocumented vessel equipped with propulsion machinery of any type. *Id.* § 1466, 33 C.F.R. § 174.19(a) (1980). See 33 C.F.R. § 173.13 (1980) for certain exempt vessels, including vessels used *exclusively* for racing. [A documented vessel is a vessel which has obtained (1) a registry, (2) an enrollment and license or (3) a license, from the United States, *see* 46 C.F.R. § 66.03–11 (1980), and which therefore must obtain an official number from the Coast Guard and have such number permanently affixed to its main beam. *See* 46 U.S.C. § 45 (1975); 46 C.F.R. §§ 67–11–1(a), 69.05–1(a) (1980) ]. A certificate of number also con-

tains the name and address of the vessel owner, the purpose for which the vessel is to be used, and the manufacturer's hull identification number. 33 C.F.R. § 174.19(a) (1980).

A certificate of number must at all times be available for inspection on the vessel for which it is issued when the vessel is in use. 46 U.S.C. § 1469(a) (1975) (Supp. 1980); 33 C.F.R. § 173.15 (1980). The number issued to a vessel required to have a number must be painted on, or attached to, each side of the forward half of the vessel for which it was issued. 46 U.S.C. § 1470 (1975); 33 C.F.R. § 173.27. Any person using a vessel required to have a certificate aboard must "present the certificate ... to any Federal, State or local law enforcement officer for inspection at his request," 33 C.F.R. § 173.-23 (1980), and it must be "carried on board in such a manner that it can be handed to such officers." *Id.* at § 173.25.

Smith obtained a penknife from Technician Pate and slit open the burlap covering one bale, exposing a green plastic lining, which was in turn slit open disclosing what appeared and smelled like marijuana. Using the marijuana testing kit, Smith tested the substance and obtained a positive tetrahydrocannabinol content.

Due to the sudden appearance of the defendant Whitmore on the deck of the *Relentless*, Commander Parritt called from the *Point Hannon* to inquire if the officers were having further problems. Shay informed Commander Parritt of the discovery of numerous bales of what appeared to be marijuana. Parritt ordered the seizure of the *Relentless* and the arrest of its crew.

Smith arrested the defendants and read *Miranda* warnings aloud to the three defendants simultaneously. Smith and Pate frisked the defendants for weapons, found none and brought the defendants to the *Point Hannon*. Once aboard the *Point Hannon*, Smith searched all three defendants. On the person of the defendant Bradley, Smith found an American passport and $2,105 in cash. On Whitmore, Smith found a pocket knife and a U. S. passport with the name and photograph torn out. The torn-out portions of the passport were discovered in another pocket of Whitmore's jacket.

Pate and Smith returned to the *Relentless* and secured it to the *Point Hannon* for towing. At that time and at the time it was first boarded, the *Relentless* was located at 43 degrees, 51.5 minutes north latitude, 68 degrees, 42 minutes west longitude, about two and four-fifths miles off Seal Island, two-tenths of a mile inside the 3-mile territorial limit.

The *Relentless* was towed to the Coast Guard base at Southwest Harbor, Maine, a four or five-hour trip, arriving between ten and twelve o'clock at night.

## II

## THE LAW

### A. *The Bradley and Dillon Motion*

The first motion considered by the court challenges all evidence obtained as a result of the stop and search of the *Relentless*. Defendants argue (1) that there was no reasonable or articulable suspicion of any safety or regulatory infractions warranting a safety and document inspection under 14 U.S.C. § 89, (2) that there was no reasonable suspicion or probable cause for believing that a crime had been or was being committed, and (3) that the safety and document inspection was but a stratagem to facilitate a search for contraband. The defendants contend that a vessel stop must be predicated on a reasonable suspicion of regulatory infractions or criminal activity or on some neutral administrative plan which constrains the "unbridled discretion of law enforcement officers in arbitrarily selecting potential search areas." [8]

### 1. *Statutory Authority*

 There was ample statutory authority for stopping and boarding the *Relentless*. Title 14 United States Code, section 89(a) provides:

> The Coast Guard may make inquiries, examinations, inspections, searches, seizures and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States. For such purposes, commissioned, warrant, and petty officers may at any time go on board any vessel subject to the jurisdiction, or to the operation of any law, of the United States, address inquiries to those on board, examine the ship's documents and papers, and examine, inspect, and search the vessel and use all necessary force to compel compliance.

14 U.S.C. § 89(a) (1976). The *Relentless*, an American flag vessel operating in the territorial waters of the United States, was subject to U. S. Coast Guard jurisdiction. Section 89(a) authorizes Coast Guard officers, "at any time," to address inquiries to persons aboard vessels subject to the jurisdiction of the United States, to examine the ship's documents, and to examine, inspect, and search any such vessel, employing all

---

8. Reply Memorandum of Defendants Bradley and Dillon, filed January 7, 1982, at 11.

necessary force. The statute itself requires no suspicion of criminal activity. *United States v. Warren*, 578 F.2d 1058, 1064 (5th Cir. 1978) (*en banc*).

Additional statutory authority is found in title 19 United States Code, section 1581(a):

> Any officer of the customs may at any time go on board of any vessel or vehicle at any place in the United States or within the customs waters . . . and examine the manifest and other documents and papers and examine, inspect, and search the vessel or vehicle and every part thereof and any person, trunk, package or cargo on board, and to this end may hail and stop such vessel or vehicle, and use all necessary force to compel compliance.

19 U.S.C. § 1581(a) (1970). "Officer of the customs" includes "any commissioned, warrant and petty officer of the Coast Guard." 19 U.S.C. § 1401(i) (1970). *See also* 14 U.S.C. § 143 (1949). The "customs waters" extend 4 leagues, approximately 12 nautical miles, from the coast of the United States. Petty officers Smith and Shay, who boarded the *Relentless* in "customs waters," are duly constituted officers of the customs empowered to board and search every part of the vessel, as well as any package or cargo on it. 19 U.S.C. § 1581(a).

2. *Constitutionality*

The Fourth Amendment to the United States Constitution provides that

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

■ The direction by a law enforcement officer that a vehicle (vessel) stop, constitutes a "seizure" of its occupants, within the meaning of the fourth amendment. *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 1395, 59 L.Ed.2d 660 (1979). *See United States v. Mendenhall*, 446 U.S. 544, 553, 100 S.Ct. 1870, 1876, 64 L.Ed.2d 497 (1980); *Terry v. Ohio*, 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968); *United States v. Williams*, 617 F.2d 1063, 1071 n.1 (5th Cir. 1980) (*en banc*). The seizure of those on board, and the subsequent search of, the *Relentless* fall within one or more exceptions to the general requirement of a warrant, as discussed below. *See, e.g., Delaware v. Prouse*, 440 U.S. at 654 n.11, 99 S.Ct. at 1396; *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967).

a. *The Stop and the Boarding.*

■ The stop and the boarding of the *Relentless*[9] fall within at least two exceptions to the warrant requirement: (i) the "border search" exception; and (ii) the vessel "safety and document inspection" exception.[10]

i. *"Border Search" Exception*

■ On the basis of "the long-standing right of the sovereign to protect itself by stopping and examining persons and property coming into this country," *United States v. Ramsey*, 431 U.S. 606, 621–22, 97 S.Ct. 1972, 1981, 52 L.Ed.2d 617 (1977), the Supreme Court has held that persons and property may be searched without a warrant or probable cause upon crossing the border into the United States. *See Torres v. Com. of Puerto Rico*, 442 U.S. 465, 99 S.Ct. 2425, 61 L.Ed.2d 1 (1979); *United*

---

**9.** The defendants have "standing" to challenge the stop. *See United States v. Williams*, 589 F.2d 210, 214 (5th Cir. 1979) [passengers possess standing to object to vessel stop and boarding], modified *en banc*, 617 F.2d 1063 (5th Cir. 1980). *See also Rakas v. Illinois*, 439 U.S. 128, 150, 99 S.Ct. 421, 434, 58 L.Ed.2d 387 (1978) (Powell, J. and Burger, C. J. concurring) and at 160 n.5, 99 S.Ct. at 439 (White, Jr., dissenting). While aboard the *Relentless* at sea, the defendants had a legitimate expecta-

tion of freedom from unreasonable seizures of their persons.

**10.** Due to the plain applicability of the "border search" and "safety and document inspection" exceptions, the court need not consider whether there were sufficient articulable facts to support a reasonable suspicion of criminal activity. *See United States v. Green*, 671 F.2d 46 (1st Cir. 1982).

States v. Ramsey, 431 U.S. at 619, 97 S.Ct. at 1980; Carroll v. United States, 267 U.S. 132, 153, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1924) (dictum); United States v. Stanley, 545 F.2d 661 (9th Cir. 1976), cert. denied, 436 U.S. 917, 98 S.Ct. 2261, 56 L.Ed.2d 757 (1978). Not even a "mere suspicion" of criminal activity is required for a border search. United States v. Freeman, 579 F.2d 942, 946 (5th Cir. 1978); United States v. Himmelwright, 551 F.2d 991 (5th Cir. 1977); United States v. Ingham, 502 F.2d 1287, 1291 (5th Cir. 1974), cert. denied, 421 U.S. 911, 95 S.Ct. 1566, 43 L.Ed.2d 777 (1975); United States v. Solmes, 527 F.2d 1370 (9th Cir. 1975); United States v. Odland, 502 F.2d 148 (7th Cir. 1974); United States v. Stornini, 443 F.2d 833 (1st Cir. 1971) [random customs search permitted]; Henderson v. United States, 390 F.2d 805 (9th Cir. 1967). Warrantless searches of persons and conveyances crossing our international border "are reasonable simply by virtue of the fact that they occur at the border." [11] United States v. Ramsey, 431 U.S. at 616, 97 S.Ct. at 1978.

■ While border searches need not even be predicated on a suspicion of criminal activity, such searches must be conducted at the border or its "functional equivalent," Almeida-Sanchez v. United States, 413 U.S. 266, 272–73, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973). The "border search" exception is not satisfied absent evidence "that the vessel crossed the 3-mile territorial waters' mark or ... articulable facts from which the customs agents may reasonably infer that the vessel has come from international waters...." United States v. Zurosky, 614 F.2d 779, 787–88 (1st Cir. 1979). See United States v. Tilton, 534 F.2d 1363, 1366–67 (9th Cir. 1976); United States v. Ingham, 502 F.2d at 1291.

■ The Relentless was stopped and searched at the border or its "functional equivalent." The personnel of the Point Hannon observed the border crossing. The border [12] was a mere two-tenths of a mile astern of the Relentless when the stop occurred. The functional equivalent of an ocean border may reasonably be considered more extensive than that adjacent to a land border.[13] See Almeida-Sanchez, 413 U.S. at 272–73, 93 S.Ct. at 2539 (dictum) [St. Louis airport functional equivalent of border for nonstop flight from Mexico City] United States v. Solmes, 527 F.2d 1370, 1372 (9th Cir. 1975) ["bay adjacent to an ocean" functional equivalent of border for vessels traveling in foreign waters prior to entry]; United States v. LaFroscia, 485 F.2d 457, 458 (2d Cir. 1973) [dock on which auto offloaded from ship functional equivalent of border]. The Relentless was stopped as close to the actual ocean border as could reasonably be expected. See United States v. Freeman, 579 F.2d 942 (5th Cir. 1978) [impractical to stop and inspect every vessel precisely at the actual border, an imaginary line on the ocean].

11. Warrantless border stops and searches are considered inherently more reasonable than other warrantless searches and seizures because they take place at designated places, usually well-marked, known and advertised, thus enabling the occupants to elect when, where and whether to risk search. Cf. United States v. Martinez-Fuerte, 428 U.S. 543, 559, 96 S.Ct. 3074, 3083, 49 L.Ed.2d 1116 (1976) [vehicle stop at fixed checkpoint is less intrusive than roving-patrol stop, since motorists are "not taken by surprise"].

12. The territorial waters of the United States extend 3 nautical miles from the coastline. See Cunard S. S. Co. v. Mellon, 262 U.S. 100, 122–23, 43 S.Ct. 504, 506–07, 67 L.Ed. 894 (1923). See also 43 U.S.C. § 1301(a)(2) (1976).

13. There are no fixed arteries along which ocean border checkpoints may be established. Pleasure vessels need not report to customs upon arrival in the United States, see 19 U.S.C. § 1441(3) (1970), but may land at enumerable locations along the coast. A band of water of substantial breadth adjacent to the 3-mile limit should be recognized as the functional equivalent of the border to permit effective policing of our maritime boundaries. See, e.g., United States v. Freeman, 579 F.2d 942 (5th Cir. 1978) [prescribing the customs waters, i.e., extending 12 nautical miles from the coast, as the functional equivalent of the border]. The First Circuit points out that "the mobility of an ocean vessel in many ways exceeds that of a car, justifying warrantless intrusion without probable cause for customs inspections far from the technical borders of the United States." United States v. Miller, 589 F.2d 1117, 1125 n.3 (1st Cir. 1978), citing United States v. Ingham, 502 F.2d 1287 [search of vessel recently arrived from foreign port].

■ The search of the *Relentless* satisfies the First Circuit requirement that there be evidence that the vessel actually crossed the maritime border, *see United States v. Zurosky*, 614 F.2d at 787–88. The *Relentless* was first seen at least 5 to 10 and perhaps 12 nautical miles from the *Point Hannon*, which was drifting approximately one-half mile off Seal Island. The *Relentless* was heading in a north-northeasterly direction toward Isle Au Haut, from the open sea. It entered U. S. territorial waters near Seal Island.[14] It was kept under constant surveillance from the time it was first sighted in international waters until it was stopped and boarded two-tenths of a mile inside U. S. territorial waters.

### ii. *"Safety and Document Inspection" Exception*

■ The stop and boarding of the *Relentless* was also incident to an authorized safety and document inspection, a recognized exception to the warrant requirement and to the requirement of a particularized suspicion of unlawful activity. *See, e.g., United States v. Hayes*, 653 F.2d 8, 12 (1st Cir. 1981); *United States v. Arra*, 630 F.2d 836 (1st Cir. 1980); *United States v. Shelnut*, 625 F.2d 59, 61 (5th Cir. 1980) (*dictum*) [U. S. vessel in international waters may be boarded for inspection without particularized suspicion], *cert. denied*, 450 U.S. 983, 101 S.Ct. 1520, 67 L.Ed.2d 818 (1981); *United States v. Hilton*, 619 F.2d 127, 131 (1st Cir.), *cert. denied*, 449 U.S. 887, 101 S.Ct. 243, 66 L.Ed.2d 113 (1980); *United States v. Williams*, 617 F.2d 1063, 1077–78 (5th Cir. 1980) (*en banc*) [reasonable to stop and board American vessel outside 12-mile limit under section 89(a) without a modicum of suspicion]; *United States v. Harper*, 617 F.2d 35, 38 (4th Cir. 1980) (*dictum*) [stop and boarding of American commercial vessel on high seas without particularized suspicion was lawful, because performed pursuant to policy of systematic stop and inquiry at checkpoint]; *United States v. Warren*, 578 F.2d 1058, 1064–65 (5th Cir. 1978) (*en banc*) [may board any American flag vessel, without particularized suspicion, and conduct document and safety inspection], *modified on other grounds*, 612 F.2d 887 (1980).[15]

A warrantless safety and document inspection of a U. S. vessel in international waters was upheld by the First Circuit in *United States v. Hilton, supra*, notwithstanding the absence of a reasonable suspicion of wrongdoing, by reason of: (1) the diminished expectation of privacy aboard a vessel as opposed to a home or office; (2) the inherent mobility of vessels at sea; (3) the long history of regulatory stops and inspections of oceangoing vessels; (4) the important governmental interest in policing ocean borders and in promoting the safety of American vessels on the high seas; and (5) the limited nature of the intrusion. The First Circuit distinguished random motor vehicle license and registration stops, found impermissible in *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), as follows:

> While the Coast Guard is thus left with considerable discretion in deciding which vessels to stop, we believe such discretion is virtually unavoidable in a scheme of regulation that depends on stops conducted at sea, far from courts and magistrates.

619 F.2d at 133.

■ In *United States v. Arra, supra*, the First Circuit reaffirmed *Hilton*, again emphasizing the important governmental objectives served by document and safety inspections and the absence of alternative

---

**14.** The map of "Penobscot Bay and Approaches" admitted in evidence covers only about 5 nautical miles of the area south-southeast of Seal Island where the *Relentless* entered territorial waters.

**15.** *But see United States v. Piner*, 608 F.2d 358 (9th Cir. 1979) (2–1 decision) [boarding pleasure craft *after dark* to conduct safety and document check requires at least reasonable, articu-lable suspicion or compliance with neutral administrative standards]; *United States v. Demanett*, 629 F.2d 862, 868 (3d Cir. 1980) (*dictum*) ["certainly there are alternatives other than unbridled discretion"]; *United States v. Streifel*, 665 F.2d 414, 422 (2d Cir. 1981) [for purposes of Coast Guard seizures on the high seas, the more intrusive the stop, the stronger the governmental law enforcement interest required].

means of achieving those objectives. 630 F.2d at 841. *Arra* held valid a high seas search "limited to checking documentation and inspecting safety equipment and conditions...." *Id.* at 846.[16] Such an administrative inspection is

consistent with the Supreme Court's excusal of administrative warrants in situations where 'the burden of obtaining a warrant is likely to frustrate the governmental purpose behind the search.' *Camara v. Municipal Court*, 387 U.S. 523, 533, 87 S.Ct. 1593, 1596, 32 L.Ed.2d 87 (1972) (1967); *United States v. Biswell*, 406 U.S. 311, 316, 92 S.Ct. 1593, 1596, 32 L.Ed.2d 87 (1972). The mobility and numerosity of vessels, and the vastness of the sea, make it impossible to provide for issuance of administrative warrants, in advance, on a vessel-by-vessel basis. And the alternative, issuance of some kind of open-ended process prior to a cutter's departure on patrol, *see* 3 W. LaFave, *Search and Seizure* § 10.8(f) at 43–44 (Supp. 1980), would seem to be largely a formalistic exercise.

*Id.* at 842.

The same "unique confluence of ... policies," *United States v. Hilton*, 619 F.2d at 132, that justifies warrantless safety and document inspections of vessels on the high seas would seem to provide *a fortiori* support for warrantless safety and document inspections of vessels within the territorial waters of the United States. Any legitimate expectation of privacy must diminish as a vessel approaches the ocean border of the United States, where more frequent Coast Guard inspections are to be expected. The mobility of vessels and the long history of shipping regulation remain important governmental concerns in territorial waters. The important governmental interest in policing ocean borders and identifying vessels operating within territorial waters must be said to increase as vessels approach our shores.[17] The governmental interest of the host nation in promoting vessel safety would appear to reach its peak within its own 3-mile limit. Finally, in order effectively to perform its international duty to regulate the safe and lawful operation of its own flag vessels on the high seas, safety and document inspections must be performed by the flag nation both within and beyond its territorial waters. Vessel safety and document inspections within the 3-mile limit, without either a warrant or a suspicion of wrongdoing, are as necessary and no more intrusive, and, therefore, as reasonable, as they are on the high seas. *See United States v. Whitaker*, 592 F.2d 826 (5th Cir.) [document check of vessel in inland waterway reasonable where vessel was followed from customs waters], *cert. denied*, 444 U.S. 950, 100 S.Ct. 422, 62 L.Ed.2d 320 (1979); *United States v. Postal*, 589 F.2d 862 (5th Cir. 1979) [routine document check of vessel within 12-mile limit without articulable suspicion]; *United States v. Freeman*, 579 F.2d 942 (5th Cir. 1978) [stop for document check two and eight-tenths miles off coast reasonable in absence of even a modicum of suspicion]. *Cf. United States v. Williams*, 617 F.2d at 1088 n.30 [permitting customs search in contiguous zone, with less

---

**16.** In *Arra*, the First Circuit pointed to the presence of articulable facts which would have provided a basis for questioning the validity of the Florida registration number on the side of the vessel stopped for a document inspection, *"if any such reason were needed."* *Id.* at 846 (*emphasis added*). The defendants argue that this language indicates that the First Circuit has not yet decided whether a reasonable suspicion of safety or regulatory violations is a prerequisite to a valid safety and document stop and search. Not so. The First Circuit was merely demonstrating that the suspicion of wrongdoing present in *Arra* was sufficient to justify a search going beyond the bounds otherwise appropriate for a safety and document inspection. *See id.* at 842 n.8. Distinguishing *Delaware v.*

*Prouse, supra*, in *United States v. Hilton, supra*, the First Circuit made clear its opinion that the Coast Guard need not have a reasonable suspicion of a safety or regulatory infraction in order to conduct a *safety and document inspection*. In *United States v. Green*, 671 F.2d 46, at 53 (1st Cir. 1982) the First Circuit reiterates that a reasonable suspicion is only necessary for Coast Guard searches going *beyond the scope of a safety and document inspection*.

**17.** "[T]here is less likelihood that a vessel in international waters is engaged in smuggling than one in customs waters...." *United States v. Williams*, 617 F.2d 1063, 1087 (5th Cir. 1980) (*en banc*).

than reasonable suspicion; indicating alteration of earlier Fifth Circuit view intimating "probable cause" requirement for searches in either territorial or customs waters].

### iii. *Coast Guard Motive Irrelevant*

■ The argument that the document and safety rationale for stopping and boarding the *Relentless* fails because the real purpose of the boarding was to search for contraband has been rejected by the First Circuit. In *United States v. Arra*, 630 F.2d at 845, the Court said:

> We do not think the motivation for a particular boarding is relevant where, as here, an objective basis for conducting the document and safety check existed.

The First Circuit further noted that:

> Ordinarily the legitimacy of a search is not dependent upon the searching officer's subjective intention ... [T]he officer's suspicion that he might come across something for which he has not been authorized to search does not invalidate the search.

*Id.* at 845 n.12, *citing United States v. Baker*, 609 F.2d 134, 139–40 (5th Cir. 1980); *United States v. Hare*, 589 F.2d 1291 (6th Cir. 1979); *Scott v. United States*, 436 U.S. 128, 138, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978). *See also United States v. Hillstrom*, 533 F.2d 209 (5th Cir. 1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 734, 50 L.Ed.2d 749 (1977). The subjective standard for which the defendants contend would place a premium on dissemblance by law enforcement personnel and would burden courts with the intractable task of ascertaining the true motivation of Coast Guard personnel. *United States v. Arra*, 630 F.2d at 845 n.12, 846; *United States v. Hayes*, 653 F.2d at 12. The First Circuit therefore requires that the court look not into the minds of the Coast Guard personnel, but to their actions. *United States v. Arra*, 630 F.2d at 846. *See also United States v. Willis*, 639 F.2d 1335, 1337 (5th Cir. 1981); *United States v. Demanett*, 629 F.2d 862, 869 (3d Cir. 1980), *cert. denied*, 450 U.S. 910, 101 S.Ct. 1347, 67 L.Ed.2d 333 (1981).

■ The actions of the *Point Hannon* personnel were entirely consistent with a legitimate safety and document inspection. The fact that the *Relentless* appeared to be a pleasure craft forbidden from carrying cargo or passengers for hire, *see* 46 U.S.C. § 103, and that it was riding low in the water, together with the fact that the *Relentless* appeared to be a vessel required by federal law to carry a certificate of number,[18] provided objective bases for conducting a document and safety inspection. After boarding the *Relentless* the Coast Guard had a legitimate continuing basis for pursuing its safety and document inspection, due to the fact that the crew of the *Relentless* did not produce the required certificate of number.

### b. *Subsequent Searches*

■ Although the defendants do not specifically challenge the scope of subsequent searches, consideration needs to be given to the reasonableness of the conduct

---

**18.** Most undocumented vessels must have a number issued either by the Coast Guard or by a state. *See* note 7 *supra*. The number must consist of two capital letters, denoting the state of the issuing authority, followed by either (a) not more than four numerals followed by not more than two capital letters, or (b) not more than three numerals followed by not more than three capital letters. 33 C.F.R. § 174.23 (1980). Owners of vessels principally used in Delaware obtain their certificate of number from the State of Delaware and the first two digits are "DL".

When observed from the *Point Hannon* from about a mile away, the *Relentless* displayed the visible indicia of a vessel required to possess a certificate of number. It displayed the two letters denoting that the State of Delaware was the issuing authority, followed by numbers required by federal regulation. The coastguardsmen were aware, well in advance of the boarding, that the *Relentless* had propulsion machinery. *See* 46 U.S.C. § 1466. The Coast Guard had no reason to believe the *Relentless*, which displayed an American flag, was a foreign vessel exempt from the numbering requirements, *see* 33 C.F.R. § 173.11(a) (1980). Although the *Relentless* appeared to be a racing boat (Tr. 57), there was no reason to believe that it was used *exclusively* for racing. The number on the vessel indicated that the *Relentless* was required to carry a certificate of number. The Coast Guard therefore had an objective basis for a document inspection.

of the coastguardsmen in (1) proceeding to go belowdecks, (2) ordering that the curtain and the cargo and cockpit compartments be opened, and (3) slitting open the burlap wrapping and plastic lining covering one of the bales.[19]

Considering these subsequent searches as necessary incidents of a border search, it is clear that each was proper. In *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), the Supreme Court stated that

> [t]ravellers may be so stopped in crossing an international boundary . . . to identify . . . [themselves] as entitled to come in and [their] belongings as effects which may be lawfully brought in.

*Id.* at 154, 45 S.Ct. at 285. In *United States v. Ramsey*, 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977), the Court stated that border searches to examine "persons and property crossing into this country, are reasonable. . . ." *Id.* at 616, 97 S.Ct. at 1978. The Fifth Circuit has explained that

> [e]xtensive customs searches in territorial waters are universally thought to be legitimate; such searches protect an important national interest—the prevention of smuggling; smuggling activities would be almost impossible to detect without such searches; people crossing into the nation's territorial waters know they are likely to be searched; and vessels are searched only because they belong to a morally neutral class.

*United States v. Williams*, 617 F.2d at 1085. The degree of intrusion permitted during a border search depends on the level of suspicion aroused by the object of the search. *Cf. United States v. Dorsey*, 641 F.2d 1213, 1216–17 (7th Cir. 1981) [case-by-case analysis of objective factors in light of agent's experience is only method to evaluate reasonableness of *patdown*]. Where the circumstances of the stop or of a preliminary inspection raise a suspicion of illegality, a more extensive border search is permissible. *See United States v. Aulet*, 618 F.2d 182, 184–85, 188–89 (2d Cir. 1980) [suspicious statements during airport customs inspection justified referral to private examination room]; *United States v. Garcia*, 616 F.2d 210, 212 (5th Cir. 1980) (*per curiam*) [suspicious shape of truckbed justified referral to secondary inspection site]. Certainly, proceeding belowdecks on the *Relentless* was within the bounds of a proper border search. The search involved in ordering the opening of the curtain and looking behind it was well within the bounds of a border search for "property crossing into this country," *United States v. Ramsey*, 431 U.S. at 616, 97 S.Ct. at 1978, the more so by reason of the strong odor of marijuana emanating from belowdecks. The resultant exposure of a third crewman behind the curtain, in an area filled with large bales, gave rise, at the very least, to a strong suspicion of criminal activity, including smuggling, possession of a controlled substance and the hauling of cargo by a pleas-

**19.** The court does not imply that the defendants have "standing" to question such conduct. Crew members generally have little legitimate expectation of privacy in "[m]ost of the areas subject to a safety inspection, such as the engine room, bilges [and] holds." *United States v. Arra*, 630 F.2d at 841 n.6. *See also United States v. DeWeese*, 632 F.2d 1267, 1270 (5th Cir. 1980) [no legitimate expectation of privacy in common areas of commercial vessel]; *United States v. Williams*, 589 F.2d 210, 214 (5th Cir. 1979) [crew member has no privacy interest in cargo area of merchant vessel], *reh. en banc*, 617 F.2d 1063, 1084 (5th Cir. 1980) [*Rakas* leaves open the possibility that owner of vessel or cargo may have some privacy interest in the hold]; *United States v. Hensel*, 509 F.Supp. 1364, 1371 (D.Me.1981) [crewman has little, if any, expectation of privacy in wheelhouse, the holds or his exposed cabin, all of which would be within "plain view" of safety and document inspectors]; *United States v. Streifel*, 507 F.Supp. 480, 487 (S.D.N.Y.) [crewmen may have expectation of privacy in living quarters, but not in hold], *aff'd.* 665 F.2d 414 (2d Cir. 1981). The area exposed to Smith's view when Bradley pulled back the curtain was described in the testimony as a space forward of the ladder behind a purple curtain. It was apparently designed to serve as the sleeping area for the crew, but it was filled with bales. No evidence was offered as to whether this area was being used as quarters for the crew and it does not appear that any unused space remained for that purpose. The issue would be close, but since the court finds these searches valid, it need not determine "standing." *See Rakas v. Illinois*, 439 U.S. 128, 133–34, 99 S.Ct. 421, 425, 58 L.Ed.2d 387 (1978).

ure craft [*see* 46 U.S.C. § 103], warranting inspection of other parts of the vessel.

The search belowdecks was also justified, at least in part, as a continuing safety and document inspection. When defendant Bradley returned on deck to say he could not find the "certificate of numbers," Smith was justified in going below to examine the main beam number. *See United States v. Hayes*, 653 F.2d at 12 [routine cursory search of pilot house, forward holds and top deck of undocumented vessel for weapons and persons who might pose a threat]; *United States v. Hilton*, 619 F.2d at 133 [inspection belowdecks justified by confused state of registration papers]; *United States v. Cortes*, 588 F.2d 106 (5th Cir. 1979) [search for ship identification within bounds of safety and document inspection where no documentation tendered].

Although the area behind the curtain may have been beyond the scope of a proper safety and document inspection,[20] by that time, if not earlier, there were reasonable, articulable grounds for suspecting that the vessel or those on board were engaged in criminal activity, such as smuggling. *United States v. Green*, at 53 (1st Cir. 1982). Once Smith arrived belowdecks, the articulable grounds for suspecting criminal activity included: (1) the approach of the *Relent-*

*less* toward the Maine coast from the open sea, an unusual route for a sailboat; (2) the somewhat suspicious course changes made by the *Relentless*;[21] (3) the fact that the *Relentless*, which appeared to be a pleasure craft forbidden by 46 U.S.C. § 103 from carrying passengers or cargo for hire, was sitting low in the water; (4) the extreme reluctance of the defendant Bradley to stop the vessel for boarding, which was overcome only by a show of armed force; (5) the evasive responses to document inspection inquiries; (6) the failure to produce a certificate of number; and, most importantly, (7) the strong odor of marijuana emanating from the vessel and, particularly, from belowdecks. Although a reasonable suspicion of criminal activity based on articulable facts does not give the Coast Guard "carte blanche to search living quarters or personal effects such as footlockers," *United States v. Green, supra,* at 53, it would seem to the court clearly sufficient to warrant inspection of the area behind the curtain and in the cockpit storage compartments.[22]

Upon detecting the strong odor of marijuana emanating from the lawfully discovered bales, Officer Smith violated no legitimate expectation of privacy by slitting

---

**20.** For a comparison of cases dealing with the legitimate scope of safety and document inspections not based on a reasonable suspicion, see *United States v. Demanett*, 629 F.2d 862, 869 n.4 (3d Cir. 1980).

**21.** Defendants offer a plausible explanation for the sudden course reversals by the *Relentless.* The area surrounding Seal Island has been designated as a "danger area" on navigational charts, including the chart found aboard the *Relentless.* The *Relentless* was approaching the designated "danger area" when it first reversed its direction. It is *possible* that the defendants did not realize that the *Relentless* was approaching the "danger area" until it was almost into it and that they thereupon became so apprehensive (coincidentally with the approach of the *Point Hannon*) that they abruptly reversed direction, rather than turning more gradually away. Nevertheless, it was certainly not unreasonable for the coastguardsmen to become suspicious of such an abrupt change of direction, particularly since the vessel had been observed approaching the Maine coast from the open sea. It was reasonable for the coastguardsmen to become more suspicious of the

vessel when it abruptly reversed direction again, back toward the "danger area," and lowered its sails far from land. After watching the *Relentless* travel in a straight course for approximately two hours without stopping, it seems reasonable for the coastguardsmen to consider it suspicious for the *Relentless* suddenly to reverse direction upon coming in closer range of a Coast Guard cutter.

**22.** The fact that the search extended into an area designed to serve as quarters for the crew does not render the search unreasonable. As the First Circuit noted in *United States v. Green*, at 53 n.11 (1982):

The fact that the crew also bunked in the cabin below would not render the cabin generally off limits to searching officers on a boat of this size [52 feet] and character [a sloop], where virtually all shipboard functions might be expected to take place in the cabin area, including storage of some cargo. The *Relentless* is a 46-foot, sloop-rigged racing boat.

one open. The heightened aroma of marijuana emanating from areas of the vessel filled with large burlap bales rendered their contents in "plain view." *See Robbins v. California*, 453 U.S. 420, 427, 101 S.Ct. 2841, 2846, 69 L.Ed.2d 744 (1981). The defendants could have had no legitimate expectation of privacy as to the contents of bales which "so clearly announce[d] [their] contents ... that [their] contents [were] obvious to an observer." *Id.*

## B. *The Whitmore Motion*

The defendant Whitmore seeks the suppression of all evidence obtained as a result of the stop of the *Relentless*, on the grounds that the stop amounted to an arrest of the defendant, without probable cause.[23] Whitmore argues that any reasonable person, even one entirely innocent of crime, would have felt that he was being arrested if approached by a boarding party armed with side arms and displaying a shotgun.[24]

■ The fourth amendment provides that

The right of the people to be secure in their persons ... against unreasonable searches and seizures, shall not be violated, and no warrants shall issue but upon probable cause. ...

Prior to *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the guarantee against unreasonable seizures of persons required that any fourth amendment "seizure" (synonomous at that time with "arrest") be based on probable cause. *Dunaway v. New York*, 442 U.S. 200, 208–9, 99 S.Ct. 2248, 2254, 60 L.Ed.2d 824 (1979). In *Terry*, a brief, on-the-spot stop on the street, together with a weapons frisk, was held to be so much less an "intrusion on the sanctity of the person," 392 U.S. at 20, 88 S.Ct. at 1879, that it could not be considered an "arrest," thus obviating the requirement of probable cause, 442 U.S. at 209, 99 S.Ct. at 2254. The showing required for a reasonable "stop and frisk" is to be determined by balancing the limited intrusion upon individual privacy against the governmental interests in crime prevention and detection, and police safety. *Id.* Although the Supreme Court has been careful to preserve the narrow focus of the *Terry* exception, *see id.* at 210, 99 S.Ct. at 2255, following *Terry* other "seizures" of persons have been held permissible in the absence of probable cause. *See, e.g., United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), [brief investigatory, vehicle stops by roving border patrol];[25] *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) [order to get out of car stopped for traffic violation]. Border detentions and safety and document inspections likewise fall within limited exceptions to the probable cause requirement. *See, e.g., United States v. Zurosky*, 614 F.2d 779 at 788; *United States v. Hilton*, 619 F.2d at 131.

■ Whenever the intrusion on individual privacy reaches the degree associated with a traditional arrest, it must be based on probable cause. *Dunaway v. New York*, 442 U.S. 200, 212, 99 S.Ct. 2248, 2256, 60 L.Ed.2d 824 (1979). Thus, where a suspect was taken from his neighbor's home to the police station, placed in an interrogation room and not informed that he was "free to go," an arrest occurred for which probable cause was required. *Id.* at 213, 99 S.Ct. at 2257.

---

**23.** Whitmore also argues that the stop was made without a reasonable suspicion of criminal activity. This argument requires no further consideration.

**24.** Conceding the force of this contention, *arguendo*, Whitmore cannot bring himself within it. There is no evidence that he saw, heard or contemporaneously learned of anything that happened before, during or for some time after the boarding. The show of force by the coastguardsmen could not have been viewed from belowdecks and nothing the coastguardsmen said before or during the boarding and for some time thereafter suggested that the boarding was for any purpose other than to investigate for compliance with all U. S. law. *See United States v. Vargas*, 643 F.2d 296 (5th Cir. 1981); *United States v. White*, 648 F.2d 29 (D.C.Cir. 1981).

**25.** *See also United States v. Martinez-Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) [stopping vehicle at established checkpoint].

The distinction between "arrests" and lesser intrusions requiring no showing of probable cause may become more obscure in practice. Courts have found seemingly substantial police intrusions on individual privacy and freedom to be investigatory stops. *See, e.g., United States v. Vargas,* 643 F.2d 296, 298 (5th Cir. 1981) (*per curiam*) [two officers, having made vehicle stop with siren and lights, approached with guns drawn but out of sight]; *United States v. Moore,* 638 F.2d 1171, 1174 (9th Cir. 1980) [police raised their guns to prevent a taxi from driving off and detained the suspects in the caged, rear seat of the police car until the arrival of customs officials]; *United States v. Martin,* 636 F.2d 974, 977 (5th Cir.) [police detained a suspect for forty minutes while obtaining the consent of a car rental agent to search the car, but gave the suspect no reason to believe he was not free to leave], *cert. denied,* 451 U.S. 917, 101 S.Ct. 1995, 68 L.Ed.2d 309 (1981); *United States v. Gomez,* 633 F.2d 999, 1006–07 (2d Cir. 1980) [officers blocked the only exit from a suspect's second-floor apartment and kicked the door, demanding entry], *cert. denied,* 450 U.S. 994, 101 S.Ct. 1695, 68 L.Ed.2d 194 (1981); *United States v. Bowles,* 625 F.2d 526, 532 n.6 (5th Cir. 1980) [agent blocked suspect's path in an airport and requested identification and ticket]. *But see, e.g., United States v. Williams,* 630 F.2d 1322, 1324 (9th Cir. 1980) [officer orders suspect out of mobile home, frisks and places him in the back of patrol car]; *United States v. Hill,* 626 F.2d 429, 435–36 n.9 (5th Cir. 1980) [agent requests suspect to accompany him to airline's private office for further interrogation after suspect twice refused to consent to search]; *United States v. Deggendorf,* 626 F.2d 47, 53 (8th Cir.) [police take suspect from airport "police room" to United States Attorney's office], *cert. denied,* 449 U.S. 986, 101 S.Ct. 405, 66 L.Ed.2d 249 (1980).

The Court of Appeals for the District of Columbia recently outlined several factors distinguishing investigatory stops from arrests. In *United States v. White,* 648 F.2d 29 (D.C.Cir.1981), it stated:

> When a 'stop' ends and an arrest begins has been the subject of numerous judicial decisions.... Judge Leventhal, concurring in *Bailey v. United States,* 389 F.2d 305 (D.C.Cir.1967), provides a framework for considering the question:
>
>> Whether there has been an arrest turns on whether there has been an imposition of custody, *and this is a determination made after examining both the objective circumstances and the subjective feeling those circumstances are likely to evoke.*
>
> *Id.* at 314 (emphasis supplied). Among the circumstances courts consider when making this decision are: the officer's intent in stopping the citizen; the impression conveyed to the citizen as to whether he was in custody or only briefly detained for questioning; the length of the stop; the questions, if any, asked; and the extent of the search, if any, made.
>
> The lines drawn are not always sharp ones. Each situation is unique, involving the weighing and measuring of contrary indicators.

648 F.2d at 33–34 (*Footnotes omitted*).

"The use or display of arms may, but does not necessarily, convert a stop into an arrest." *Id.* at 34. "[U]tilization of force in making a stop will not convert the stop into an arrest if it is precipitated by the conduct of the individual being detained." *United States v. Beck,* 598 F.2d 497, 501 (9th Cir. 1979). *See also United States v. Vasquez,* 638 F.2d 507, 523 (2d Cir. 1980). Thus, "[a] police officer attempting to make an investigatory detention may properly display some force when it becomes apparent that an individual will not otherwise comply with his request to stop...." *United States v. Thompson,* 558 F.2d 522, 524 (9th Cir. 1977). In *United States v. Streifel,* 665 F.2d 414 (2d Cir. 1981), the Second Circuit held that the Coast Guard did not make an unreasonable show of force in stopping a vessel by firing six warning shots in front of the ship's bow after the ship had failed, for some twenty minutes, to stop on request. *Id.* at 424.

In *United States v. Arra,* 630 F.2d at 845, n.11, the defendants, who were stopped by a boarding party of four of the eight mem-

bers of a Coast Guard cutter, argued that a document and safety check was tainted by an excessive display of force. Although one member of the boarding party carried a loaded shotgun, the other two carried handguns, and a fourth, who remained in the boarding boat, was armed with a rifle, the First Circuit felt that it was "in no position to say that the size of the boarding party or their display of arms was unreasonable." *Id.* The court noted that the boarding party could have been taken hostage and that it was not uncommon for the Coast Guard to encounter "a criminal element" in the course of safety and document checks.[26]

 The intrusion on Whitmore's liberty, if indeed any occurred prior to the time he was discovered behind the curtain belowdecks, did not reach the magnitude associated in the case law with traditional arrests. After Whitmore and the marijuana were discovered there was probable cause for his arrest. Upon approaching the *Relentless*, the officers informed the defendants that they intended to inspect the *Relentless* for compliance with all U. S.

laws. The show of force involved in displaying the shotgun was precipitated by the uncooperative conduct of the other two defendants and was reasonable and necessary in view of the failure to shut down the engines of the *Relentless* despite repeated requests.[27] Neither the number of coastguardsmen involved in the initial boarding nor the weapons carried can reasonably be considered beyond what was prudently required for dealing with the unpredictable criminal conduct which the Coast Guard encounters with increasing frequency in the course of its safety and document checks. *See United States v. Arra*, 630 F.2d at 845 n.11. The official questioning was well within the bounds of either a border search or a safety and document inspection. The detention preceding the discovery of the marijuana was brief and the scope of the ensuing searches was limited. There was no arrest of the defendants, most emphatically not of the defendant Whitmore, until after the discovery of bales smelling of marijuana, which provided probable cause for the arrests.[28]

---

**26.** *Arra* involved an after-dark inspection of a yacht in rough water, on the high seas 35 miles offshore, with four crew members in view.

**27.** Defendant Whitmore relies heavily on *United States v. Beck*, 598 F.2d 497 (9th Cir. 1974), in support of his position that the Coast Guard displayed excessive force in stopping the *Relentless*. In *Beck*, the Ninth Circuit found that an arrest had occurred, *id.* at 502, where police officers used overwhelming force in stopping a taxi in which the defendants were riding. The taxi was stopped by four cars, containing nine customs officers. After following the taxi for 20 minutes, the officers "boxed in" the taxi, by causing one vehicle to pull in front of the taxi, one to stop to its left and one to pull in behind it, with emergency lights activated. Six agents approached the taxi on foot. Three stood on the median strip across from the taxi. One officer showed his badge and opened one of the taxi doors while the other agents opened the other doors. The three passengers were asked to get out and, as they did, two agents took each man by the arms to different locations in the vicinity of the taxi, and asked routine questions.

The Ninth Circuit held that, while the question was close, an arrest did occur at least by the time each man was taken to separate locations in the vicinity of the taxi. It noted that the officers had no reason to fear for their safety or to fear flight by the defendants. They

had no reasonable basis to believe the men were committing a crime and they used physical force on the defendants despite unhesitating compliance with the officers' instructions.

Clearly, *Beck* is distinguishable from the case presently before the court. The show of force in stopping the *Relentless* was not nearly as extreme. The method used to stop the *Relentless* was not as indicative of an arrest and no physical force was directly applied to the defendants.

**28.** Even if the court were to find that the Coast Guard displayed excessive force in stopping and boarding the *Relentless*, suppression of the fruits of the document and safety inspection would not be appropriate. *United States v. Arra*, 630 F.2d at 845 n.11. The test for determining whether to suppress evidence as the fruits of a prior illegality is whether—

granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.

*Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

This fact-specific inquiry should take account of '[t]he temporal proximity of the arrest and [the discovery of the illegal (sic) evidence], the presence of intervening circumstances ... and *particularly*, the purpose and flagrancy of the official misconduct....'

III

## CONCLUSION

The motions to suppress must be denied.

IT IS SO ORDERED.

*United States v. Pimental,* 645 F.2d 85, 86 (1st Cir. 1981), *quoting Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) (*footnotes omitted*) (*emphasis supplied*).

The evidence defendants seek to suppress was not discovered by exploitation of any illegal arrest of the defendants. It was not obtained incident to an arrest under *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). It was in "plain view" during the border search and the safety and document inspection.